Jeffrey H. Reeves, Esq. (State Bar No. 156648)
jreeves@tocounsel.com
Todd C. Theodora, Esq. (State Bar No. 120426)
ttheodora@tocounsel.com
Jessica Hernandez Diotalevi, Esq. (State Bar No. 244501)
jdiotalevi@tocounsel.com
Michael E. Bareket, Esq. (State Bar No. 272230)
mbareket@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone: (714) 549-6200
Facsimile: (714) 549-6201

Attorneys for Plaintiffs James J. Peterson,
Frederick Goerner, Paul Pickle, and Philip
Sansone

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JAMES J. PETERSON, an individual; FREDERICK GOERNER, an individual; PAUL PICKLE, an individual; and PHILIP SANSONE, an individual,<br><br>        Plaintiffs,<br><br>   vs.<br><br>STEVEN SANGHI, an individual; GANESH MOORTHY, an individual; MITCH LITTLE, an individual; JAMES ERIC BJORNHOLT, an individual; MICROCHIP TECHNOLOGY INC., a Delaware corporation; and DOES 1-10,<br><br>        Defendants. | Case No. 8:18-cv-02000-JLS (ADSx)<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT** |

Plaintiffs JAMES J. PETERSON ("Peterson"), FREDERICK GOERNER ("Goerner"), PAUL PICKLE ("Pickle"), and PHILIP SANSONE ("Sansone") (collectively, "Plaintiffs") make the following allegations and prayers for relief against Defendants MICROCHIP TECHONOLGY INC. ("Microchip"), STEVE SANGHI ("Sanghi"), GANESH MOORTHY ("Moorthy"), MITCH LITTLE ("Little"), JAMES ERIC BJORNHOLT ("Bjornholt" and, along with Sanghi, Moorthy, and Little, the "Individual Defendants"), and Does 1 through 20 (collectively, "Defendants"). Plaintiffs allege on information and belief as follows:

## I.    INTRODUCTION

1.    Plaintiffs are the former senior management of Microsemi Corporation ("Microsemi" or the "Company"). They have been at the helm of Microsemi for many years, some of them as long as 18 years. They collectively built Microsemi into a juggernaut of the semiconductor industry and a Wall Street darling. The Company never failed to meet or exceed guided quarterly earnings targets from 2007 to 2018, an unbroken streak of eleven years. And revenues were continuing to grow year over year.

2.    In 2017, Microsemi was on a roll. Net sales for the year exceeded $1.81 billion and the Company reported profits of $1.16 billion. The first half of 2018 saw the continuation of Microsemi's success under Plaintiffs' leadership. For the six months ended in April 1, 2018, Microsemi reported net sales of $961 million and gross profit of $579 million, and forecasted that net sales for fiscal year 2018 would exceed $2 billion.

3.    Due to Plaintiffs' collective success in building, growing and running Microsemi, they enjoyed well-earned reputations in the industry as executives with integrity who possess exceptional business acumen. Those reputations are understandably important to Plaintiffs. But those reputations have unfortunately now taken a beating at the hands of Defendants.

4.    Sometime in early to mid-2017, Microsemi caught Sanghi's eye. The Company was not for sale, but Sanghi was enamored with Microsemi's revenues, and

THEODORA ORINGHER
COUNSELORS AT LAW

its profit margins which well-exceeded those of his own company, Microchip.  And, as will be explained, he had other, darker, reasons to pursue Microsemi, too.  So, in the latter half of 2017, Microchip approached Microsemi and made an unsolicited offer to purchase the Company.  Shortly thereafter, and well before the March 1, 2018 announcement that Microchip intended to purchase Microsemi (the "Merger") and that the companies had signed a merger agreement (the "Merger Agreement"), Plaintiffs and their team began complying with and meeting every one of their legal responsibilities to provide Defendants with all of the information they requested about Microsemi.

5.      Defendants had a fiduciary duty to obtain the best possible price for Microchip's shareholders, which means they needed to be laser-focused on and truly understand Microsemi's revenues, the sources for those revenues, the accounting for those revenues, and the Company's sales, shipping and inventory patterns and practices.  Without understanding those things, it would be impossible for Defendants to discharge their fiduciary duties.  To that end, Defendants assembled a due diligence team comprised of no fewer than 25 people to request information from Microsemi about its business, and to digest and understand all of that information.  If, at any time, Defendants or their colleagues felt that there was any shortage of information from Microsemi on any topic – such as historic shipping levels, the amount of inventory in Microsemi's distribution channel, the Company's revenue recognition practices, or product demand – they needed only to ask Plaintiffs for that information.  In fact, prior to the closing of the Merger on May 29, 2018 (the "Closing"), Plaintiffs responded to every single request for information they received from Defendants with complete candor.  Nothing was concealed.

6.      Specifically, in cooperation and consultation with Defendants' diligence team, Plaintiffs provided a huge amount of data regarding Microsemi's operations, financial performance, and its planning and forecasting processes.  Plaintiffs had countless meetings and conversations with Microchip executives, and populated the virtual "Data Room" with 8.3 gigabytes of information (more than 4,650 files),

including data regarding Microsemi's distribution channel inventory.  Microsemi's April 19, 2018 Proxy Statement confirms all of this:

> On February 2, 2018, Microsemi received a written due diligence request list from Microchip, and Microsemi provided Microchip with access to Microsemi's virtual data room.  During the remainder of February 2018, Microsemi, Microchip and their respective advisors participated in diligence calls and Microsemi and its advisors responded to additional diligence requests from Microchip and its advisors.

7.     That statement is entirely true, and no one from Microchip ever claimed otherwise prior to the Closing.  Besides uploading 8.3 gigabytes of information to the Data Room, including data detailing five quarters' worth of Microsemi's inventory levels, and answering innumerable questions from Defendants and their team, Plaintiffs also provided a great deal of diligence information directly via email.  In December 2017, Plaintiff Goerner gave a PowerPoint presentation to Microchip executives that provided explicit data regarding Microsemi's revenue sources, including information sufficient to show the proportion of revenue attributable to distributors versus customers.  Similarly, on or around April 11, 2018, Plaintiff Sansone provided a report to Defendants that contained detailed channel inventory levels going back three years clearly showing that Microsemi and its distributors kept on average three to four months of inventory in the distribution channel.  In fact, both Goerner and Sansone had follow-up meetings with Little to discuss and explain these details well before the Closing.

8.     Given Defendants' fiduciary duties to truly know what they were buying, Plaintiffs are informed and believe that Sanghi and the rest of Microchip's Board of Directors were satisfied that their diligence team had requested, and that Microsemi had provided, all of the information that Defendants needed in order to understand all material aspects of the Company's operations, especially its revenue recognition, sales, and shipping practices, and how much inventory Microsemi and its distributors kept in

the distribution channel.  Plaintiffs are informed and believe that Sanghi and Microchip's Board of Directors, therefore, concluded that the price Microchip was paying for Microsemi was fair, and the deal proceeded to close on May 29, 2018. Sanghi publicly hailed the Merger, describing it as the union of "two of the strongest business franchises in [the semiconductor] industry", and forecasted that the deal would be "immediately accretive" to Microchip's earnings.

9.      Sanghi's glowing comments about Microsemi were true when made, and are true now.  However, unbeknownst to Plaintiffs at the time, Sanghi had three illicit goals that would inspire a campaign wherein he would contradict those true statements, replace them with blatantly false statements, and defame Plaintiffs — all for his own personal gain.  Sanghi's three illicit goals were (1) to falsely blame Plaintiffs and Microsemi for Microchip's financial struggles, (2) to fabricate a justification to deny Microsemi employees their earned compensation, and (3) to artificially depress Microchip's stock prices so he and the other Defendants could secure more favorable financial arrangements for Sanghi and his co-Defendants.

10.      After the Closing, Defendants began a concerted and intentional effort to defame Plaintiffs in furtherance of these illicit goals.  Defendants have repeatedly claimed that Plaintiffs "over-shipped" inventory and that there was "excess" inventory in the channel, "facts" they claim to have only become aware of after closing.  Those statements are also false.  Plaintiffs always shipped product commensurate with demand.  That there was no excess demand is borne out by the fact that there were no aberrational product returns before or after the Closing.  There simply was no "over-shipping" or "excess" inventory, and to say otherwise is false and misleading.

11.      Defendants stated that they did not know until after the Closing that Microsemi and its distributors maintained four months of inventory in the channel. This is also a lie.  In truth, prior to the Closing, Microsemi disclosed to Microchip all confidential information available and necessary to understand the Company's sales and shipping activities, all of which were proper.  Indeed, Sansone provided Little with

a report in April 2018, well before the Merger closed, showing that there were four months of inventory in the channel and that those inventory levels had persisted with all product lines for many years. That there were four months of inventory in the channel was no surprise to Defendants, and any statement to the contrary is demonstrably false.

12. Sanghi and Defendants have also defamed Plaintiffs by stating that Microsemi used a "fake revenue process" to pump up revenue numbers. That statement is false. As Defendants know full well because they had unfettered access to the data pre-Closing, Microsemi had an excellent audit process. That process was subject to review by both an internal audit team and an external PwC audit team. These audits showed that Microsemi was not making or reporting revenue from illusory sales; all sales were final and customers had a limited right to return only up to five percent (5%) of purchased products. That five percent return rate was always reserved and not taken as revenue and all revenue that was reported was recognized properly in accordance with Generally Accepted Accounting Principles ("GAAP"). To call these processes "fake" is false and misleading.

13. It is clear that Defendants' many lies were made in service of their three illicit goals.

14. First, Sanghi needed to blame Plaintiffs for Microchip's underperformance. Microchip's business before the acquisition of Microsemi ("Legacy Microchip") had been performing worse than Defendants had forecast due to numerous mistakes made by Sanghi. Sanghi knew that after the Closing the newly combined company would perform poorly due to systemic problems at Legacy Microchip, even though adding Microsemi was accretive to Microchip as a whole. This underperformance was a threat, not only to Defendants' credibility as semiconductor executives, but also to Defendants' relationship with their financiers. To finance the acquisition of Microsemi, Defendants had to borrow upwards of $8 billion in revolving credit and term loans. This was no small feat as Microchip more than quadrupled its total indebtedness. To secure the best possible terms on that debt, Defendants had to

represent to its lenders that Microchip would not exceed certain earnings-to-debt leverage ratio levels.  Post-Closing, Microchip's leverage ratio exceeded the levels it had forecasted to its lenders.  Sanghi sought to deflect blame from himself and onto Plaintiff's for this failing, and for Microchip's overall poor financial performance. Specifically, Sanghi  fabricated the claims detailed above, and asserted that Microsemi was performing poorly (when, in truth it was performing well), and that, due to unethical conduct and a cover up on the part of Plaintiffs, Microchip was unable to discover that Microsemi was a poor company until after the deal had closed. That statement is false. In truth, Plaintiffs had at all times acted, properly, candidly and truthfully in connection with the sale.

15.   Second, Sanghi wanted to avoid paying bonus and incentive compensation, including commissions, that he owed to Microsemi employees.  Saving money in this fashion would improve Microchip's cash performance and free up Sanghi to pay larger cash dividends, and as explained below, no single shareholder benefits from higher cash dividends more than Sanghi.  Sanghi knew, however, that in order to close the Merger, Microchip would have to agree to pay (and did agree to pay) Microsemi employees the same compensation to which they had previously been promised. Sanghi never had any intention of paying this compensation; indeed, Sanghi routinely brags that Microchip's salesforce does not receive commissions.  And, Sanghi had a plan for causing Microsemi employees to blame Plaintiffs – instead of blaming Sanghi – for not getting paid.  At an all-hands meeting, Sanghi claimed that Microchip would not pay incentive compensation in 2018 because, after the Closing, Microchip learned for the first time that Plaintiffs had "stuffed the channel" and used "fake revenue" processes that supposedly caught Defendants by surprise.  These claims were false.  In truth, all of Microsemi's revenue numbers were real and properly accounted for, and Microchip had been informed and knew about all of Microsemi's expenses and inventory levels well before Closing.  These false allegations against Plaintiffs have caused their former colleagues at Microsemi to be scornful of Plaintiffs, even though

Plaintiffs did nothing wrong, and Sanghi's decision not to pay incentive compensation in reality had nothing to do with Plaintiffs' conduct.

16.     Third, Defendants wanted to depress Microchip's stock price to enrich themselves.   Defendants' compensation packages included the grant of Microchip stock.   The amount of stock they receive is based on a corresponding dollar value approved by the Compensation Committee of Microchip's Board of Directors, and the number of shares awarded is equal to that dollar value divided by the stock price at the time of granting.   This means that if the stock price is low, Defendants would receive more stock than if the stock price is high.   Defendants wanted to receive more stock, not less, and, therefore, wanted to depress Microchip's stock price such that they received more stock compensation on the dip, knowing all the while that the stock price would eventually rebound since there was actually nothing wrong with the fundamentals of the Microsemi acquisition in the first place.   There is no question that Defendants had a perverse financial incentive to make statements that would cause Microchip's stock price to fall (temporarily) before they received their equity awards. Defendants engaged in their calculated, elaborate scheme to manipulate Microchip's stock price downward by defaming Plaintiffs to create false and short-lived headwinds for Microchip.

17.     By obtaining favorable debt financing terms for the Merger, cutting employee compensation and bonuses, and lowering Microchip's performance forecasts, all while justifying their actions with defamatory statements regarding Plaintiffs, Defendants were able to obtain larger equity grants and benefit from the issuance of record dividend payments to Microchip shareholders in each of the three quarters following the Merger.  Sanghi, as Microchip's largest individual shareholder, benefitted more than any other single shareholder from Defendants' scheme.

18.     Defendants' audience for their false statements has not been confined to the conference rooms and offices of Microsemi or Microchip.  Defendants have spread these lies far and wide; the lies have gained substantial traction in the industry press

where they are being accepted and repeated as though they are true. Investor's Business Daily reported on August 10, 2018 that Microchip had encountered "unexpected problems" after acquiring Microsemi, suggesting that Defendants were somehow caught unaware by the facts after the Closing. The publication went on to report Defendants' false allegations that Microsemi had "stuffed its sales channel with inventory to inflate its revenue figures ahead of the . . . deal closing." Similarly, one JP Morgan analyst wrote:

> We believe that 70% of the miss [announced August 9, 2018] was from [Microsemi] and attributed to MSCC distribution channel stuffing which implies that true demand revenue was well below what MSCC had been reporting over the last few quarters. As a result, MSCC had inflated revenues leading up to the acquisition . . . .

These statements are false, but the analysts repeat what they hear from Defendants as if the statements are factual.

19. Plaintiffs' character is invaluable to them. They spent years – decades – cultivating their stellar reputations. Yet now, in light of the above, they are regularly embarrassed to be confronted with these false statements as they try to move on with their lives and to other jobs in the industry. Plaintiffs have heard directly from enraged former colleagues who blame them for Microchip's decisions to tamp down revenue and to use that as an excuse not to pay bonuses. And, Plaintiffs routinely get questions from financial analysts who naturally assume – because Sanghi says so – that they have committed fraud, shipped product into the channel without demand, and engaged in false and misleading revenue recognition practices.

20. Plaintiffs are not willing to tolerate this any longer. That is why, prior to filing this Complaint, Peterson and Pickle sent a letter to Sanghi, the other individual Defendants, the Audit Committee for Microchip's Board of Directors, and all other Microchip Directors, identifying the defamatory statements that Defendants have made, explaining precisely why those statements are provably false, and politely asking that Defendants take steps to correct the record now by retracting those statements and

agreeing to refrain from repeating them in the future.  As of the date of the filing of this Complaint, Defendants have not only refused to retract the defamatory statements, but Plaintiffs are informed and believe that they intend to double-down on those statements by continuing to repeat them and reinforce them publicly.  Plaintiffs have thus been left with no choice but to bring this lawsuit to clear their names, restore their reputations, seek redress for the harms they have suffered, and seek punitive damages to punish and deter similar conduct in the future.

## II.    THE PARTIES

21.    At all times relevant herein, Plaintiff Peterson was a resident of Orange County, California.

22.    At all times relevant herein, Plaintiff Goerner was a resident of Orange County, California.

23.    At all times relevant herein, Plaintiff Pickle was a resident of Orange County, California.

24.    At all times relevant herein, Plaintiff Sansone was a resident of San Diego County, California.

25.    Defendant Microchip is a corporation organized and existing under the laws of the State of Delaware that has its principal place of business in Chandler, Arizona.  Microchip is a publicly traded company that trades under the "MCHP" ticker symbol on the Nasdaq Stock Market.  On information and belief, Microchip maintains offices in Lake Forest, California.  In addition, Microchip directed activity to Orange County by purchasing Microsemi, a company headquartered in Aliso Viejo, California.

26.    Upon information and belief, at all times relevant herein, Defendant Sanghi was and is a resident of Maricopa County, Arizona.

27.    Upon information and belief, at all times relevant herein, Defendant Moorthy was and is a resident of Maricopa County, Arizona.

28.    Upon information and belief, at all times relevant herein, Defendant Little was and is a resident of Maricopa County, Arizona.

29.     Upon information and belief, at all times relevant herein, Defendant Bjornholt was and is a resident of Maricopa County, Arizona.

30.     Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sues those parties by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when they are ascertained.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that Plaintiffs' injuries as herein alleged were proximately caused by such defendants.

## III.     JURISDICTION AND VENUE

31.     On October 9, 2018, Plaintiffs commenced an action in the Superior Court of the State of California, County of Orange, captioned James J. Peterson, et al. v. Steven Sanghi et al., Case no. 30-2018-01023948.

32.      This is a civil action over which the Court has original jurisdiction under 28 U.S.C. § 1332(a)(1), and it was removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. § 1441(b)(1), as a civil action between citizens of different states with a matter in controversy in excess of $75,000.00, exclusive of interest and costs..

33.     Because  the initial Complaint in this action was filed in the Superior Court of the State of California, County of Orange, venue is proper in the Central District pursuant to 28 U.S.C. § 1441(a).

## IV.     FACTUAL BACKGROUND

### A.     Microsemi

#### 1.     A Diverse and Successful Company

34.     Microsemi was founded in 1959 as "MicroSemiconductor," changing its name to Microsemi in 1983.  Microsemi made a reputation for itself supplying radiation laboratories with semiconductors known as "miniature diodes."  These diodes were ideal components for radiation instrumentation, which radiology technicians could use

to accurately track and keep a patient's radiation exposure within acceptable levels. From Microsemi's founding through the 1980s, Microsemi almost exclusively manufactured and sold electronic components (*e.g.* resistors, transistors, diodes, etc.) for the defense and medical industries.

35.     When defense budgets decreased between 1989-2000, Microsemi diversified its core business by acquiring semiconductor companies that catered to the exploding voice and data communications markets.  In 1999, Microsemi acquired its first integrated circuit company – Linfinity.  Linfinity's then-CEO was Plaintiff Jim Peterson and, in 2000, Peterson was named President and CEO of Microsemi.

36.     Integrated circuits, also known as microchips or "chips," drive the digital economy.  They are the "brains" of all modern electronics, and have revolutionized the way modern societies work, communicate, travel, entertain, harness energy, and treat illnesses.  A typical chip consists of a set of electronic circuits, made up of individual electronic components, layered together on semiconductor material, most commonly silicon.  Through the precise combination of relatively simple circuits, integrated circuits can perform complex, specified tasks for almost any application.  As a result, integrated circuits are ubiquitous today and can be found in all manner of consumer goods, such as televisions, laptop computers, tablets, mobile phones, as well as in state-of-the-art equipment used by the world's most sophisticated players in aerospace and defense, healthcare, and beyond.  Under Peterson's leadership, Microsemi became a market leader in producing high-reliability integrated circuits and diversified its product portfolio.

37.     In addition to supplying state-of-the-art semiconductors, Microsemi adds significant shareholder value by providing comprehensive systems solutions.  Some of these solutions, for instance, help large international businesses achieve network synchronization and accurate time stamping, whether the operating environment is an office building or miles below the Earth's crust – or even in space.  The comprehensive and customizable aspects of these solutions have contributed to Microsemi's success in

enterprise IT markets for regulatory compliance, data analysis, data logging, and auditing across multiple industries, such as government, financial, healthcare, education, retail, smart grid, transportation and more.

### 2.   Over Two Decades, Plaintiffs Turned Microsemi into a Juggernaut

38.   Peterson managed Microsemi from 2000 until May 2018, transforming Microsemi into a world leader in manufacturing and distributing high-performance integrated circuits, offering a comprehensive portfolio of semiconductor and system solutions for the communications, defense, aerospace and industrial markets.   In spearheading Microsemi's growth into a diverse and successful semiconductor company, Peterson assembled a top-flight management team that included Plaintiffs Pickle, Goerner, and Sansone.

39.   Pickle joined Microsemi in 2000.   Pickle climbed his way up through Microsemi's corporate ranks, working primarily in Microsemi's integrated circuits group.   In November 2013, Pickle became President and Chief Operating Officer, positions he held until May 2018.   After Pickle was named President, Peterson remained CEO and was also named Chairman of Microsemi's Board of Directors. Pickle was expected to succeed Peterson as Microsemi's CEO.

40.   Goerner joined Microsemi in 2011 and served most recently as the Company's Executive Vice President, Worldwide Sales.   In this position, Goerner oversaw the sales of Microsemi products to all customers – original equipment manufacturers ("OEM"), contract manufacturers ("CM") and distributors – worldwide.

41.   Sansone joined Microsemi in 2014 and, until the Closing, was Microsemi's Vice President, Global Distribution Sales.   In that capacity, Sansone managed Microsemi's relationships with its distributors worldwide, a segment representing approximately half of Microsemi's total annual revenues.

### 3.   Microsemi's Distribution Business

42.   Microsemi supported a broad range of products and services; by 2018, Microsemi's products consisted of over 30,000 discrete part numbers.   In light of

Microsemi's diverse catalog, its products are in high demand from a wide-ranging base of customers of all sizes, spanning many industries, leading to a customer base that spans from mom-and-pop companies that buy very few products to massive multi-national corporations that order significant volume from Microsemi.  To meet this demand, Microsemi developed, cultivated and leveraged its relationships with distributors.  Like most similarly situated large-scale manufacturers, Microsemi sells its products to distributors, who later mark up the price of the products and then re-sell them to the ultimate customer.

43.    In turn, Microsemi's distributors are able to assist large Microsemi customers with the management of their inventory.  Microsemi customers can leverage distributors by relying on the distributors to hold an adequate supply of Microsemi product inventory and quickly and efficiently supply the products to the ultimate customer exactly on demand when the product is needed for production.  In fact, some distributors have warehouses on site at Microsemi's ultimate customers' manufacturing premises.

44.    Microsemi's distributors are also able to leverage their massive infrastructure and logistics efficiencies to service Microsemi's relatively smaller customers.

45.    In this way, Microsemi's distributors help create and meet demand for Microsemi products among customers, large and small, and help Microsemi save on infrastructure and logistical costs.

46.    Each of Microsemi's products and parts is subject to its own distinct manufacturing specifications and processes, resulting in widely varying lead times required to ramp up production to meet customer demand.  Some products require up to 40 weeks of lead time to manufacture, while others require much less.  Some products are manufactured to the specifications of individual Microsemi customers, and demand for such bespoke products is subject to the whims and business needs of that specific customer.  In particular with respect to defense products that demand is also subject to

swings in government appropriations, sequestrations and other political and geo-political factors.

47.    Distributors purchase inventory from manufacturers and then re-sell to OEMs or CMs.   Akin to the relationship between a wholesaler and retailer, manufacturers and distributors mutually benefit from the arrangement.   For the manufacturer, distributors allow for the outsourcing of sale processing and logistics for a portion of consumers, allowing the manufacturer to satisfy all kinds and amount of demand without having to constantly scale its salesforce.   Additionally, by selling inventory to a distributor, the manufacturer can redirect capital and other resources to further manufacturing or the development of new products.   Distributors on the other hand can re-sell products for a higher price and net a profit margin while not having the overhead costs of research and development or manufacturing.

48.    In addition, Plaintiffs grew Microsemi, in part, by partnering with their OEM, CM, and distributor customers to develop mutually beneficial programs and partnerships.   One such program was the Design Incentive Program ("DIP"), which incentivized synergy between Microsemi and its customers for whom Microsemi would manufacture specialized products.   Customers partnering in the DIP would allow Microsemi to participate in the customer's product design and manufacturing processes, thereby generating cost-saving efficiencies that Microsemi could then pass on to the customer.   By the end of 2017, Microsemi anticipated that the DIP program presented a $1 billion revenue opportunity for the Company going forward.

49.    To address the long manufacturing lead times associated with many Microsemi products, Plaintiffs also spearheaded a Production Incentive Program ("PIP") that provided incentives if OEM and CM customers could provide demand forecasts up to six months and, depending on those forecasts, agree to carry a buffer of inventory.   This provided manufacturing certainty for Microsemi, allowing the Company to optimize manufacturing resources, and provided distributors and customers with a reliable supply of product to meet their forecasts.   Upon information

and belief, since the Microchip acquisition, Sanghi has discontinued the PIP program.

50.     Finally Microsemi and its largest distributor, Arrow Electronics ("Arrow"), leveraged the Arrow Supply Assurance ("ASA") Program to smoothly and economically ramp down production of end-of-life ("EOL") products, without jeopardizing the needs of customers that still relied on EOL products.  Through the ASA program, Microsemi granted Arrow the exclusive right to sell EOL products during and after the period that Microsemi ramped down and ended production.  This allowed Microsemi to reallocate manufacturing and other resources to newer products, while ensuring that customers could still purchase EOL products through Arrow. Arrow, exercising its independent business judgment, understood that it could ensure profitability for the ASA program by increasing the price over time for the ever-dwindling supply of the EOL products.  The ASA program was essentially a win-win-win deal for all stakeholders.  Upon information and belief, as part of his plan to tamp down revenues so he could avoid paying bonuses and commissions to employees, Sanghi has discontinued the ASA program, despite the fact that ASA represented a $90 million revenue stream for Microsemi over the next year.

51.     In many ways, Microsemi relied upon its distributors to address market hiccups and inefficiencies – problems faced by any semiconductor manufacturer.  First, Microsemi's distributors were able to service orders from customers for which it would be inefficient to deal directly with Microsemi.  By 2018, over 10,000 customers used Microsemi products, and it was neither efficient nor economical for Microsemi to attempt to service all of their orders directly.  Indeed, some of Microsemi's larger customers preferred to purchase Microsemi's products through Arrow because they liked Arrow's delivery logistics options.  This was the case when, in 2016, one of Microsemi's largest customers, the Ciena Group ("Ciena"), requested that its purchases go through Arrow, resulting in a corresponding increase in the amount of inventory in Microsemi's distribution channel.

52.     Second, as discussed above, Microsemi leveraged the ASA program to

provide customers with a reliable supply of EOL products, allow Microsemi to more efficiently allocate manufacturing resources, and provide Arrow with a sole source, appreciating product line.

53.   Third, due to the long manufacturing lead times for many products, Microsemi leveraged its distributors to maintain the inventory necessary to mitigate against unpredictable fluctuations in demand.  Like all manufacturers, Microsemi tried to keep a buffer of inventory in its distribution channel to prevent situations where customers could not obtain Microsemi products.   For products with longer manufacturing lead times, Microsemi maintained a larger buffer of inventory in the distribution channel.

54.   During Plaintiffs' management of Microsemi, they encountered numerous occasions where unforeseen demand threatened to exhaust available inventory for certain Microsemi products.   One recent example involved a product for which Microsemi is a market leader – Voice Chips.  The production of Microsemi's Voice Chips required a 20 to 24-week manufacturing lead time.  At the same time, Voice Chips are subject to unpredictable spikes in customer demand.  In late 2017 and early 2018, two of Microsemi's largest customers for Voice Chips, both mobile phone manufacturers, unexpectedly tripled their demand.  Through Plaintiffs' foresight, Microsemi and its distributors had 14 weeks of inventory of Voice Chips available. Even that was not enough, however, and Microsemi had to pay a premium to manufacturers to expedite production of Voice Chips to meet demand.

55.   Microsemi properly reported as revenue its sales to distributors.   In accordance with GAAP and guidance from the Financial Accounting Standards Board ("FASB"), sales to distributors *are required to* be recognized as revenue at the time they are sold.  Defendants recognized as much when, in Microchip's August 9, 2018 earnings release, Sanghi stated that Microchip adopted the "GAAP revenue recognition standard which requires [Microchip] to recognize revenue at the time products are sold to distributors."

56.     While it is true that Microsemi was dutifully following GAAP revenue recognition requirements, it is also true that Microsemi's sales to its distributors represented *real revenue* that accurately reflected Microsemi's performance.  First, Microsemi's sales to its distributors were final and payment for these sales was not tied to whether or when the distributors sold the products.  Second, Microsemi's sales to its distributors were not illusory; Microsemi limited returns for all customers to a maximum of five percent (5%) of products purchased.  This maximum return rate was assumed for accounting purposes, even though customers rarely if ever returned the full five percent, and the value was reserved and not included in Microsemi's revenue totals.  In addition, all sales into the ASA program were final, and no returns were allowed.

57.     The amount of inventory that Microsemi shipped into the distribution channel every quarter was proportional to the amount of Microsemi product sold by the distributors.  Microsemi constantly sought to maintain a stable inventory buffer in the distribution channel.  Every quarter, Sansone, Microsemi's Vice President in charge of Global Distribution Sales, and his team would generate forecasts that attempted to predict the inherently unpredictable demand for Microsemi's products that would have to be met by its distributors.

58.     Microsemi's sales to its distributors were made in large part in reliance upon these forecasts.  Distributors would weigh forecasted demand against Microsemi's products' manufacturing lead times to determine how much inventory the distributor wanted to carry.  For example, because Microsemi's Hi-Reliability Discrete products had lead times of up to 40 weeks, distributors understood that they needed to carry up to six months of inventory to hedge against demand exceeding their forecasts.

59.     Carrying a buffer of inventory was a sound business practice for Microsemi's distributors because, in addition to ensuring supply of products to meet demand, many of Microsemi's products appreciated while distributors held them in inventory.  A large portion of Microsemi's products are "sole source," meaning that

product is the only option available for its particular function.  Such "sole source" products have captive demand and, as a result, distributors are able to raise prices over time.

60.    Because Microsemi's sales to it distributors were tied to ultimate demand for Microsemi products, under Plaintiffs' leadership, Microsemi inventory in the distribution channel worldwide stayed relatively stable, only increasing in the first quarter of fiscal year 2017 due to Ciena requesting to purchase through Arrow.  In the five quarters from the first quarter of fiscal year 2017 through to the first quarter of fiscal year 2018, Microsemi's inventory levels in the distribution channel held steady at just over four months of inventory; in other words, there was plainly no *"stuffing"* of the channel, no "over-shipping" of inventory in excess of demand.  And, as noted above, five quarters of Microsemi's inventory data was uploaded to the Data Room and, on April 11, 2018, Plaintiff Sansone provided Defendant Little with  three years' worth of even more detailed inventory information.

61.    To the extent Defendants had any doubts about Microsemi's historical inventory data, they never shared any of those doubts or concerns with Plaintiffs, the Company, or the public prior to the Closing.  To the contrary, on May 8, 2018, during Microchip's quarterly earnings call, Sanghi stated that Microsemi had not "seen any positive or negative surprises" during its due diligence of the Merger.

62.    Furthermore, due to the limited ability to return product, distributors were incentivized not to purchase more product than was necessary to meet demand.  Thus, market forces protected against there being too much inventory in Microsemi's distribution channel at any given time.

### 4.    Microsemi Audited its Revenue Reporting

63.    Microsemi employed robust internal controls over its financial reporting processes, including revenue recognition.  The Company, unlike Microchip, also employed an internal audit team that, pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), regularly reviewed Microsemi's internal controls, reviewing up

to 100 or more transactions every quarter. Microsemi's internal audit team coordinated with the Company's external auditor, PricewaterhouseCoopers ("PwC"). PwC conducted its own SOX-compliance audit of Microsemi's revenue recognition processes and controls, including an independent review of transactions every quarter.

64. Microsemi's internal audit team and PwC checked the Company's sales to distributors in particular to ensure that they were properly reported as revenue pursuant to GAAP which *required* sales into the distribution channel to be recorded as revenue. In addition, Microsemi's auditors consistently approved of its internal controls, finding no deficiencies, and concluded that Microsemi's sales to its distributors were properly recognized and reported as revenue.

65. For sales that were eligible for returns, customers and distributors could only return up to five percent (5%) of the sale value of any product. For revenue recognition purposes, the maximum anticipated five percent return rate was reserved on Microsemi's accounting and not reported as revenue. In addition, pursuant to Microsemi's internal controls, Microsemi's internal and external auditors would have disallowed Microsemi from reporting as revenue any transaction if there was a risk that a customer could return more than five percent of purchased goods.

66. In addition, both Microsemi, including Sansone, and PwC routinely interviewed Microsemi's distributors to confirm their inventory levels and to determine whether any distributors felt they were carrying too much inventory. Microsemi's distributors never reported any such dissatisfaction to Microsemi or PwC, and all parties consistently approved of the inventory levels in Microsemi's distribution channel.

### 5.    Microsemi Was Successful

67. From 2000 to 2017, Microsemi saw net sales grow by over 630%, from $248 million to over $1.81 billion. Over that same time period, gross profit grew by over 1500%, from $70 million to $1.16 billion.

68. The first half of 2018 saw the continuation of Microsemi's success under

Plaintiffs' leadership.  For the six months ended in April 1, 2018, Microsemi reported net sales of $961 million and gross profit of $579 million, and forecasted that net sales for fiscal year 2018 would exceed $2 billion.

69.    Due to Plaintiffs' and Microsemi's success, Microsemi became a target for acquisition.   By 2017, corporate consolidation in the semiconductor industry had reached a fever pitch, and Microsemi drew the attention of Sanghi and Microchip.

## **B.    Microchip**

70.    Microchip is a semiconductor company that engages in the development, manufacture and sale of microcontroller products, development tools used to program microcontroller products, memory products for the embedded control market, and analog, mixed signal, and timing products.  For Microchip's fiscal year ending March 31, 2018, it reported revenue of $3.98 billion.

### **1.    Defendants Have Grown Microchip Through Acquisitions**

71.    For nearly thirty years, Microchip has been under the leadership of Sanghi.  Sanghi has served as President of Microchip since 1990, CEO since 1991, and Chairman of the Board of Directors since 1993.  Sanghi is thought to be one of the most successful CEOs in the semiconductor industry because he has been able to deliver on the primary goal for investors in public companies – growth.

72.    Upon information and belief, from 1989 to present, Moorthy has been an employee of Microchip, most recently serving as President and Chief Operating Officer.

73.    Upon information and belief, from 1989 to present, Little has been an employee of Microchip, most recently serving as Vice President, Worldwide Sales & Applications.

74.    Upon information and belief, from 1995 to present, Bjornholt has been an employee of Microchip, most recently serving as Vice President and Chief Financial Officer.

75.    Unlike Microsemi's diverse suite of products, consisting of high-

performance and precision integrated circuit used by the aerospace industry and the military, the bulk of Microchip's products have become commoditized, in particular Microchip's flagship product – its line of PIC microcontrollers ("PICs").  Due to the commoditized nature of Microchip's products, manufacturing them is simpler and therefore requires shorter lead times than for Microsemi's products, and demand is more predictable. Because of this, Microchip needs less inventory in its distribution channel.  Microchip typically maintains only two to three months of inventory in the channel, compared to the three to four month inventory buffer that Microsemi maintained in the channel under Plaintiffs' leadership.

76.    In addition, Microchip owns and operates one hundred percent of its manufacturing, and thus has absolute control over timing and prioritization of its products' lead times.   Microsemi, however, utilized external foundries and subcontractors to manufacture seventy percent of its products, resulting in lead times being subject to the capacity of the external manufacturer and, thus, longer lead times.

77.    The commoditization of Microchip's products has also presented challenges in the marketplace.  An increased acceptance of semiconductor industry-wide standards has driven the growth of commoditized ARM microcontrollers that compete against Microchip's products.  Microchip thus faces increased competition and slimmer margins for its flagship products.

78.    Given these price pressures and an ever-crowding marketplace, how then could Sanghi continue to grow Microchip?  The answer was taking on an increasing debt burden to "purchase" growth.  Over the past decade, Sanghi has grown Microchip through the acquisition of at least fourteen companies.  This growth-through-acquisition strategy has accelerated along with the recent consolidation trend in the semiconductor industry.  To satisfy Microchip's shareholders' demand for growth, Sanghi has chased exponentially larger and larger acquisitions.  In 2014, Microchip acquired ISSC Technologies Corporation for $328.5 million, and Supertex for $394 million.  Microchip then acquired Micrel for $839 million in 2015, and Atmel for $3.6 billion in

1    2016.

2        79.    Microchip's stock price has rallied during Sanghi's spending spree, and

3    Sanghi has reaped the benefits.  Despite Sanghi's apparent success in driving up

4    Microchip's share price, however, he has exhibited a troubling pattern of misleading

5    behavior.  Specifically, Sanghi has routinely used Microchip's acquisitions, not just to

6    grow Microchip, but also to dupe shareholders and employees alike into believing that

7    the acquired companies were burdened with systemic problems at the time of

8    acquisition that their former management was either too inept to understand or had

9    supposedly concealed.

10       **2.    Sanghi's Pattern and Practice of Disparagement Post-Acquisition**

11       80.    Throughout Sanghi's tenure as CEO of Microchip, he has exhibited a

12   pattern of acquiring companies, accusing the acquired companies' former executives of

13   mismanagement (or worse), and using the claimed mismanagement as justification and

14   cover for denying bonuses and other compensation to employees of the acquired

15   companies.

16       81.    Sanghi's typical storyline was that the acquisitions had actually imperiled

17   Microchip because of these hidden embedded problems, meaning Sanghi would need to

18   "come to the rescue" to fix the problems time and again.  It just so happened that

19   "fixing" the situation typically involved cutting benefits to employees, thereby saving

20   Microchip money, and lowering earnings forecasts, thereby creating easier-to-reach

21   growth targets so that Sanghi and his management team could also maximize individual

22   compensation.  As will be more fully set forth below, blaming management of the

23   acquired companies enabled Microchip to cover-up its own short-comings and lack of

24   growth, to reset the bar, and set-up artificially lowered compensation targets that would

25   later be easier to beat.

26       82.    In 2015, Microchip acquired Micrel, a company founded and run by Ray

27   Zinn ("Zinn").  In an interview with the *EE Times*, the trade journal of record for the

28   semiconductor industry, Zinn related how Sanghi lavished praise on Micrel prior to

closing Microchip's acquisition of the company, only to then turn on both Zinn and Micrel.

83.     First, to assuage Zinn's concerns for Micrel employees, Sanghi assured Zinn that any layoffs due to redundancies following the merger would be borne equally by Micrel and Microchip personnel.  However, Zinn stated to the *EE Times* that, "[a]fter the deal was done, [Sanghi] flipped and said [Zinn] had a terrible company with the worst people he'd ever seen," shut down Micrel's fabrication operation, and laid off numerous Micrel employees in violation of Sanghi's promises to Zinn.

84.     Sanghi, in his own interview with the *EE Times*, further disparaged Zinn and Micrel, stating that Micrel "was horribly run."  Sanghi sought to cast himself as the savior of Micrel, stating that Microchip "did the hard work of transitioning [Micrel]" and increasing profits.

85.     Sanghi's "Jekyll and Hyde" maneuver was on display again when Microchip acquired Atmel in 2016.  In announcing the acquisition, Sanghi stated that Microchip would be "delighted to have Atmel employees join the Microchip family." However, within days of closing the merger, Sanghi and Microchip conducted an all-hands meeting with Atmel's retained employees.  According to the *EE Times*, Sanghi informed the Atmel employees that Microchip would be reneging on severance benefits Atmel had promised its U.S. employees during prolonged merger discussions.  Sanghi blamed the Atmel board of directors for failing to communicate details of the Atmel severance packages to the Microchip board.

86.     The *EE Times* further reported that Sanghi strong-armed the Atmel employees into agreeing to take half of what they had been promised by signing a letter indemnifying Microchip against any legal action.  Sanghi reportedly threatened the Atmel employees that, if they refused to sign the letter giving up their rights to the promised severance benefits, he would "beat" them in court.  Microchip has since been sued by nine Atmel employees over this practice.  *See Berman et al. v. Microchip Tech. Inc. et al.*, No. 17-cv-01864 (N.D. Cal. filed April 4, 2017).

87.     In an interview with the *EE Times* just four days after the Atmel merger closed, Sanghi disparaged Atmel, calling it the "worst performing company [Microchip] ever bought," as contextual justification for layoffs at Atmel.  Sanghi also complained that "Atmel gave [Microchip] no access prior to the closing."   This incredible assertion, in light of the due diligence that accompanies all major corporate mergers, would foretell Sanghi's subsequent false and defamatory statements regarding Plaintiffs.

88.     Unfortunately, other than the airing of grievances in the press, however, none of these companies' former managers or executives formally took Sanghi to task for his disparaging comments or his misleading and disingenuous behavior.  Instead, Sanghi was richly rewarded for it.  Upon information and belief, from April 2013 to March 2018, Sanghi was paid more than the combined total compensation paid to Microchip's four other highest paid executives, including Moorthy and Little, over the same time period.  Ironically, although he has amassed considerable personal wealth, deploying extreme cost-cutting measures – including especially cutting or minimizing employee compensation and benefits with respect to his acquired companies – has been the hallmark of Sanghi's tenure at Microchip's helm.

### C.     The Microsemi-Microchip Merger

#### 1.     Microchip and Microsemi Enter into a Merger Agreement

89.     As early as July 2017, Sanghi turned his sights to Microsemi, seeking the next acquisition to "grow" Microchip.  On July 27, 2017, a representative from J.P. Morgan Securities LLC, a financial advisor to Microchip, contacted a member of Microsemi's Board of Directors to relay Microchip's interest in completing a merger with Microsemi.   In response, Microsemi requested that Microchip tender this *unsolicited* inquiry directly to Peterson.

90.     Sanghi thereafter reached out directly to Peterson and, on September 21, 2017, Sanghi met Peterson and another Microsemi executive to discuss Microchip's unsolicited inquiry regarding a merger of the companies.

THEODORA ORINGHER
COUNSELORS AT LAW

91.     On November 9, 2017, Sanghi sent a letter to Microsemi's Board of Directors proposing that Microchip would purchase all of Microsemi's outstanding common stock at a price of $63.00 per share, "approximately" 35% to 40% of which would be paid in Microchip common stock and the remainder of which would be paid in cash.

92.     In November and December 2017, Microsemi and its Board of Directors evaluated Microchip's unsolicited offer by soliciting alternative business combinations with three other companies.  By December 15, 2017, Microsemi had received two other non-binding proposals for the purchase of Microsemi's common stock, including one for $64.65 per share, in cash – a better offer than Microchip's.

93.     Concurrently with Microsemi's negotiations with other suitors, Peterson, Pickle and other Microsemi executives continued to meet with Sanghi and Microchip. On December 27, 2017, Sanghi contacted Peterson and represented that Microchip was still interested in pursuing a transaction with Microsemi, but that Microchip needed more time to analyze the impact of the newly enacted U.S. tax legislation.

94.     Nonetheless, Microsemi and Microchip continued to negotiate and, on January 24, 2018, Microchip raised its offer to $65.00 per share, under the same terms as its November 9, 2017 non-binding offer.  That same day, Microsemi, by and through Peterson, countered at $70 per share, all cash.

95.     On January 29, 2018, Microchip proposed a cash purchase for Microsemi's common stock at $67.50 per share, subject to Microsemi granting Microchip a 30-day exclusivity period.  Microsemi's Board of Directors directed Peterson to continue negotiating with Sanghi and to provide Microchip with updated financial projections, through fiscal year 2023, which took into account recent changes in United States tax laws, Microsemi's financial results from the first quarter of its fiscal year 2018, and the guidance that Microsemi had announced for its second quarter. Over the course of January 30 and 31, 2018, Peterson spoke with Sanghi to negotiate Microchip's offer price.

96.     On January 31, 2018, Microchip submitted its "best and final" proposal to purchase all of Microsemi's common stock at a price of $68.78 per share in cash, subject to Microsemi's agreement to grant Microchip a 30-day exclusivity period. Microsemi accepted, and the two companies entered into an exclusivity agreement providing that Microsemi would discontinue negotiations with other potential bidders and negotiate exclusively with Microchip until March 1, 2018.

97.     On March 1, 2018, Microsemi and Microchip entered into the Merger Agreement and publicly announced the Merger.

98.     From March 1 and through the Closing, Sanghi lauded Microsemi. Some of Sanghi's positive comments were printed by the *Wall Street Journal* on March 1, 2018, including Sanghi's conclusion that, in acquiring Microsemi, Microchip would bring together "two of the strongest business franchises in our industry that are highly complementary and will deliver significant value for shareholders and customers." Among other things, Sanghi sought to capitalize on what he described as an "opportunity to cross-sell our chips into end marketers where [Microsemi is] strong and vice versa."

99.     These comments were reiterated and expounded upon in a news release to Microchip shareholders on March 1, 2018. There, Sanghi described "[t]he Microsemi acquisition [a]s the latest chapter of [Microchip's] strategy . . . [to] add further operational and customer scale to Microchip," particularly given "[Microsemi's] strong complementary analog and mixed-signal product lines . . . ." The news release also predicted the Microsemi acquisition would be "immediately accretive to [Microchip's] non-GAAP earnings per share," and would result in a "[s]ignificant [e]xpan[sion] [of] Microchip's solutions for Data Center, Communications, Defense and Aerospace Markets." Thus, Sanghi exclaimed, "[w]e are delighted to welcome Microsemi to become part of the Microchip team and look forward to closing the transaction and working together to realize the benefits of a combined team pursuing a unified strategy."

100.   Also appearing in Microchip's March 1, 2018 news release were glowing comments from Moorthy, who emphasized that "[both] Microchip and Microsemi have a strong tradition of delivering innovative solutions to demanding customers and markets, thus creating highly valued and long-lasting revenue streams." Going further, Moorthy touted that "[j]oining forces and combining our complementary product portfolios and end market exposure will offer our customers a richer set of solution options to enable innovative and competitive products for the markets they serve."

## 2.   Microsemi Discloses Extensive Information Before Closing of the Merger

101.   From at least September 2017, and in particular after entering into the Merger Agreement, the two companies engaged in the arduous, but necessary, exchange of information regarding Microsemi's operations and financials. The process of exchanging information in advance of a merger is time-consuming but critical for any public corporation, as the acquiring company must inform its shareholders, and the public, of what it is buying, why, and how the acquisition will affect the acquiring company's performance. Microsemi and Plaintiffs cooperated fully with Microchip, and its roughly 25-person diligence team of executives, attorneys, and bankers, throughout this process.

102.   On February 2, 2018, in response to written requests for information from Microchip, Microsemi granted Microchip unrestricted access to 8.3 gigabytes of data (more than 4,650 files) consisting of years of confidential financial and operational information that had been collected in the Data Room. Among this data was information detailing Microsemi's distribution inventory levels going back five fiscal quarters. Microsemi, Microchip and their respective advisors participated in teleconference(s) during which Microsemi and its advisors responded to additional diligence requests from Microchip and its advisors. Microsemi responded to all of Microsemi's requests to the fullest extent permitted by law, withholding only information prohibited from disclosure by anti-trust or privacy laws.

103.   Microchip, including Sanghi, and its attorneys had unfettered access to the

Data Room and received notifications whenever documents were added.  In addition, Microsemi and its attorneys could see whether information and documents in the Data Room had been accessed.  Upon information and belief, Microchip and its attorneys wholly neglected to access a large portion of the information and documents in the Data Room prior to the Closing.

104.   Had Defendants cared to look, they would have found in the Data Room all the information necessary to confirm that Microsemi's reported revenue came from bona fide sales to its OEM, CM and distributor customers and that there was *no basis* for any statement that Microsemi "stuffed" the distribution channel or reported "fake" revenues.

105.   In addition, Microsemi executives, including Plaintiffs, met frequently with Defendants and other Microchip executives to provide insight into Microsemi's complex and unique operations prior to the Closing.  These disclosures included reports and meetings regarding the amount of inventory in Microsemi's distribution channel and why Microsemi and its distributors maintained those levels.

106.   Specifically, in December 2017, well before the Merger Agreement was signed, Goerner gave a PowerPoint presentation to Sanghi and other Microchip executives that detailed Microsemi's relationships with its largest customers and the incentive programs Microsemi had put in place to drive sales, showing the proportion of Microsemi's revenue that was attributable to sales to distributors.

107.   In addition, Microchip's due diligence team conducted meetings with each of Microsemi's business units, the divisions in the Company closest to the day-to-day sales and distribution of Microsemi's products, including each business unit's management team.  These meetings were conducted without Plaintiffs or other senior Microsemi executives being present, to prevent any self-censoring and to ensure complete candor and disclosure to Microchip.

108.   Immediately after the Merger Agreement was signed, Plaintiffs began providing even more detailed information directly to Defendants.  For example, on

March 1, 2018, Pickle emailed Moorthy providing information detailing the revenue from sales by Microsemi's Discrete Products Group to Arrow. Moorthy responded that this disclosure was "very helpful."

109. On March 23, 2018, Little sent an email to Goerner requesting, on behalf of Bjornholt, detailed information regarding Microsemi's distribution processes. Defendants sought "[q]uarterly distribution inventory days for the past three years by geography and by distributor," "[q]uarterly distribution margins for the past three years by geography and by distributor," "a general description of the data [Microsemi] receive[s] from [its] distributors," identification of "[w]hich distributors/business units sell at broken cost and which ones sell on a [distributor cost] basis," and a description of "[w]hat return rights [ ] the distributors have."

110. In response, on or about April 11, 2018, Goerner and Sansone provided to Little a report detailing data on Microsemi's worldwide distribution sales (the "Inventory Report"). The Inventory Report clearly showed the amount of inventory held by all of Microsemi's distributors from 2015 through the first quarter of Microsemi's 2018 fiscal year and revealed that overall inventory levels remained steady throughout this period at, on average, three to four months of inventory.

111. Sansone and Goerner also met with Little to discuss and explain in detail Microsemi's distribution practices worldwide. Sansone and Goerner explained that, due to the manufacturing lead times for Microsemi's products and the need to ensure a buffer of supply, distributors frequently carried four months of inventory of Microsemi products at any given time. Little asked questions, listened, and gave every appearance that he completely understood and approved of Microsemi's inventory levels.

112. Later in April 2018, Sansone and Goerner met with Thomas Grune, Microchip's Vice President, Americas Sales, and Michelle Hale, a Microchip Regional Sales Manager. At that meeting, Goerner and Sansone explained Microsemi's distribution practices in North America, including the ASA program, presented data showing the amount of inventory in Microsemi's distribution channels, and explained

the reasons for those levels. Grune noted that Microsemi's four-month inventory buffer in the channel was similar to the levels that Microchip had their own distributors carry. Grune further commented that ASA was a "great program" and something that Microchip would look at as part of its own business strategy. Upon information and belief, however, Sanghi has discontinued the ASA program despite its mutual profitability to Microsemi and Arrow.

113.   In sum, Microsemi was completely transparent about its business prior to the Merger. The Plaintiffs provided to Sanghi, Little, Bjornholdt, Moorthy and Microchip all of the information conceivably necessary to understand Microsemi's distribution and revenue recognition practices and historic inventory levels.

114.   Defendants knew precisely how much inventory Microsemi's distributors had on hand, how much Microsemi product sold into the channel each quarter, and how much Microsemi's distributors in turn sold to customers. Furthermore, from the time Microchip made its *unsolicited* offer in July 2017 until the Closing, Microsemi had not changed any of its sales or distribution practices.

## 3.   Defendants Finance the Merger and Forecast Microchip's Post-Closing Performance

115.   On March 1, 2018, Microchip entered into a Commitment Letter with JPMorgan Chase Bank, N.A. ("JPMorgan") pursuant to which JPMorgan committed to provide Microchip with a loan facility of up to $5 billion to finance the Merger. JPMorgan acted as the main lending agent for a consortium of banks (the "Lenders") that collectively funded a revolving loan facility for Microchip.

116.   On May 18, 2018, Microchip and the Lenders entered into an Amended and Restated Credit Agreement (the "Loan Agreement"). The Loan Agreement provided that the Lenders would finance a revolving credit facility of $3.84 billion, $3 billion in term loans, and two senior secured notes for $2 billion in the aggregate.

117.   A primary factor affecting the borrowing terms Microchip could obtain from its Lenders was its debt to earnings ratio ("Leverage Ratio",) which is the ratio

THEODORA ORINGHER
COUNSELORS AT LAW

between Microchip's total indebtedness to its earnings before interest, tax, depreciation, and amortization ("EBITDA").

118.   On information and belief, prior to the May 18, 2018 closing of the Loan Agreement, Defendants were required to provide to the Lenders forecasts of Microchip's performance sufficient to determine what Microchip's Leverage Ratio would be for the fiscal quarters following the Closing.  The lower the forecasted Leverage Ratio, the lower the effective interest rate Microchip could receive on its Loan Agreement.

119.   Critically, at the time that Defendants provided their forecasts to the Lenders, they had access to all of the information necessary to understand Microsemi's distribution practices, its distribution channel inventory levels, and its internal audit and financial reporting procedures.

120.   On June 6, 2018, a week after the Closing, Bjornholt participated in the Bank of America Merrill Lynch Global Technology Conference. There, Bjornholt spoke publicly about Microchip's forecasts for its performance post-Closing.  Bjornholt stated that Microchip anticipated its Leverage Ratio to be 4.7 to 1 for the fiscal quarter ending June 30, 2018.  To go along with his Leverage Ratio forecast, Bjornholt also stated that Microchip anticipated Microsemi to contribute between $160 and $180 million to Microchip's EBITDA for that quarter.

121.   By August 9, 2018, however, once Microchip released its financial reporting for the fiscal quarter ending June 30, 2018, the truth was that Microchip's Leverage Ratio was 5.0 to 1, not 4.7.  As will be explained below, Defendants sought to blame Microsemi, and in particular Plaintiffs' management of Microsemi, for the fact that the Leverage Ratio was higher than Defendants had forecasted it would be to the Lenders.   Defendants did so despite the fact that, on information and belief, Microsemi's actual contribution to Microchip's EBITDA for the June 30, 2018 fiscal quarter was roughly $195 million, well in excess of the high end of Microchip's own public projections.

### 4.     After Closing, Defendants Immediately Undermine Microsemi's Performance

122.   On May 29, 2018, the Merger closed at a price of $8.35 billion, reflecting a purchase price of $68.78 per share and a total enterprise value of about $10.2 billion – by far Microchip's largest acquisition ever.  Microsemi, moreover, was a uniquely complex, diverse, and idiosyncratic company; any buyer would have needed to put in sufficient time and effort to educate itself on Microsemi's operations prior to completing an acquisition of the Company.  If Defendants' statements in the months following the Closing are to be believed, however, they failed to absorb and comprehend the vast amount of information and numerous reports provided to them by Microsemi.

123.   Compounding this choice to turn a blind eye to much of the data that Microsemi disclosed pre-Closing, Defendants inexplicably opted to disregard the institutional expertise of Microsemi's management, expertise that would have helped Defendants to better understand Microsemi's business during the post-Closing transition.    Specifically, Microchip terminated Plaintiffs and other Microsemi executives and managers on the very day the Merger closed.  Upon information and belief, Microchip completely purged pre-Merger Microsemi's upper management within a very short time following Closing, apparently oblivious to the obvious utility of the institutional knowledge possessed by those who had run the Company for the past 18 years, and had overseen its growth into the $10 billion enterprise that Sanghi had so coveted before the Closing.  Incredibly, Defendants would later point to this purge of valuable institutional knowledge at Microsemi as a point of comfort for distraught investors and Microsemi employees.

124.   From the Closing to today, neither Sanghi, Little, nor anyone else in Microchip's management have contacted Plaintiffs to discuss Microsemi's business practices, including how Microsemi managed inventory in the distribution channel.

125.   In addition, Microchip has exhibited either a complete lack of

understanding of Microsemi's operations or an intentional desire to undermine the performance of the Company.  Microchip has dropped profitable Microsemi product lines and manipulated the pricing on other products creating a deleterious effect on demand.

126.  As alleged above, since the Microchip acquisition, Sanghi has discontinued the ASA program, despite the fact that ASA represented a $90 million revenue stream for Microsemi over the next year.  As a result of this termination, Microsemi has been forced to accept Arrow's return of EOL products, losing Microsemi millions of dollars in the process.

127.  Upon information and belief, since the Microchip acquisition, Sanghi has discontinued the DIP and PIP programs, despite the fact that Plaintiffs had viewed the programs as a potential $1 billion market opportunity for the Company.

128.  Most egregiously, since the Closing Defendants have instructed Microsemi's salespeople to withhold shipments of product that Microsemi's customers have ordered.  Defendants have justified this instruction by claiming that they needed to "clear the distribution channel" of excess inventory.  As shown below, however, this explanation makes no sense.

129.  All of these steps have only served to hamstring Microsemi's ability to generate revenue and be "accretive" to Microchip's shareholders, as Defendants had promised.  It appears that this was Defendants' intent.

130.  When, on August 9, 2018, Microchip released its earnings for the 1st quarter of its 2019 Fiscal Year, it pointed to alleged Microsemi shortcomings to justify and excuse its own poor performance, specifically reporting that it was "adversely impacted by $226.9 million of Microsemi purchase accounting, restructuring and other charges," and further inaccurately claiming that "Microsemi was extremely aggressive in shipping inventory into the distribution channel."  Microchip refused to provide GAAP earnings guidance to its investors and refused to report on Microsemi's post-Merger performance despite the fact that Microchip had previously provided guidance

on that number.  By raising alarm bells about Microsemi's performance and refusing to provide guidance, Defendants succeeded in spooking Microchip's shareholders, and Microchip's share prices dropped sharply, by over 15-percent.  These events unfolded less than a week before Microchip's annual stockholder meeting on August 14, 2018, where the stockholders overwhelmingly approved the compensation of Microchip's named executive officers, including Sanghi, on an advisory (non-binding) basis.

131.   An objective observer may question why Defendants apparently ignored the vast array of information regarding Microsemi's operations, dismissed those employees who were best positioned to assist with the integration of the Company into Microchip, and then set about undermining much of what made Microsemi successful. It is now apparent that Defendants had no interest in being informed regarding Microsemi's business or maximizing the value of Microsemi for the benefit of Microchip's shareholders.  Their intent from the beginning was to undermine the unique sales programs and distribution relationships Microsemi had fostered over the years, all while portraying Microsemi as a struggling company, throwing Plaintiffs under the bus in the process in order to mask Microchip's own deficiencies. Defendants apparently assumed that their feigned ignorance of Microsemi's operations would provide them with cover, and plausible deniability, to then cut benefits for Microsemi and Microchip employees and, conveniently, obtain favorable compensation packages, and record dividend payments, for themselves.

### D.   Defendants' Defamatory Statements

132.   Sanghi and Microchip had unfettered access to all the information necessary to understand the manufacturing lead times for Microsemi's products, consumer demand to both Microsemi and its distributors, historic inventory levels in the distribution channel, and the proper bases for Microsemi's revenue recognition practices.

133.   Despite this, after the Closing, Defendants began a deliberate and malicious campaign to misrepresent what Microchip knew about Microsemi's business

prior to closing.  Specifically, Defendants have publicly, and falsely, (1) accused Plaintiffs of improperly "over-shipping" product and "stuffing" the distribution channel with inventory that was not tied to demand, and (2) claimed that they were unaware and unable to know prior to the Closing how much inventory Microsemi had in the channel, even insinuating that Plaintiffs *hid* shipping and inventory levels from Defendants before the Closing.  At times, Defendants have gone so far as to imply or support the inference that Plaintiffs have engaged in fraud by gaming Microsemi's revenue numbers in advance of merger negotiations.  Because of Plaintiffs' supposed misdeeds, Defendants claimed that Microsemi would generate much less revenue than expected, and only Defendants could remedy the situation, but not before some pain had to be borne by Microsemi (and Microchip) employees, as well as Microchip shareholders.

134.   Defendants wasted no time pushing this concocted, defamatory narrative about Plaintiffs.  On information and belief, on May 30, 2018, only one day after the Closing, Sanghi, Moorthy, Little, Bjornholt, and the rest of Microchip's senior management addressed Microsemi employees.  Sanghi, despite conceding that Microsemi was one of the "most profitable [companies Microchip] ever bought," made several untrue, disparaging remarks about Plaintiffs to diminish Plaintiffs' professional reputations and goodwill with Microsemi's employees.

135.   Sanghi described Microsemi's culture as one of "executive extravagance" and "waste."  In discussing his "cultural observations" of Microsemi, Sanghi opined that, out of the roughly twenty companies Microchip had acquired during Sanghi's 28-year tenure as CEO, Plaintiffs' "excess" was unprecedented.

136.   Sanghi chastised Microsemi's former management for having maintained season tickets for Bay Area and Orange County sports teams, insinuating that Microsemi's management chose to "waste" money on frivolities.  Sanghi neglected to mention that two of the "luxury suites" that he maligned were inherited by Microsemi via acquisitions of the companies that originally purchased the tickets, that one suite had been fully paid for prior to it being acquired by Microsemi, or that Microsemi had

tried to sell the suites, but without success.  Moreover, Sanghi falsely claimed that he only became aware of these "extravagances" post-Closing, even though these items were fully disclosed to Defendants well before Closing.

137.   Sanghi also criticized Microsemi's philanthropic and charitable activities, dismissing them as wastes of money.

138.   Comparing the Microsemi and Atmel acquisitions, Sanghi indicated that both Atmel and Plaintiffs improperly encouraged their respective sales forces to prioritize their commissions ahead of the best interests of the company.  Sanghi claimed Plaintiffs' poor incentives led to massive inventory stuffing through heavily discounted sales, comparable to "two monkeys fighting and taking the price down."

139.   Most egregiously, Sanghi started laying the groundwork for his most blatant, and harmful, lies about Plaintiffs – <u>first</u>, that Plaintiffs stuffed distribution channels to create "fake" revenue and, <u>second</u>, that Plaintiffs failed to disclose (even hid) Microsemi's inventory levels in the channel prior to the Closing, and that Microchip only became aware of those inventory levels after the Closing.

140.   The very first day after the Closing, Sanghi complained that he had *just* discovered that "Microsemi revenue ha[d] grown pretty much all through acquisitions," and that, "[i]f you look at the last ten years . . . organic revenue growth was near zero." Sanghi falsely stated that, Microsemi management, including Plaintiffs, misrepresented Microsemi's growth rate.

141.   In another preview of defamatory statements to come, Sanghi represented to Microsemi employees that Plaintiffs were to blame for the fact that Microsemi employees' merit-based bonuses would be suspended indefinitely.  This appeared to Microsemi employees to be a violation of Microchip's obligations pursuant to Section 6.12(b) of the Merger Agreement to provide retained Microsemi employees, for one year after the Closing, with "compensation and benefits the value of which is not less favorable [than] the compensation and benefits provided" prior to the Closing.  When asked to explain how Microchip could do this, Sanghi falsely claimed that it was "the

fault of your own management [*i.e.* Plaintiffs] that wouldn't give [Microchip] access so we could understand and address these things."

142.   Over the following months, these two central lies would be repeated by all Defendants, and then rebroadcast by industry journalists, causing immense personal and professional harm to Plaintiffs.

## 1.   Defendants Lied About Microsemi's Performance Under Plaintiffs' Leadership

143.   Defendants have consistently lied about Plaintiffs' performance while at Microsemi and the success of the Company under Plaintiffs' leadership.  Specifically, Defendants have repeatedly stated that Plaintiffs utilized "fake" revenue processes and stuffed distribution channels to recognize "excess" revenue that "was higher than real end market demand."

144.   These statements are outright lies.  Under Plaintiffs' leadership, sales to Microsemi's distributors and CMs were final, nonreturnable sales that were properly reported as revenue pursuant to GAAP.  Furthermore, Microsemi inventory levels remained relatively stable in the years leading up to the Merger, increasing at the end of 2016 due to Microsemi's termination of its distribution arrangement with Avnet.  This stability in inventory levels, always hovering around four months, demonstrates that the amount Microsemi was shipping into the distribution channel reflected ultimate demand.

145.   Defendants have repeated this lie on multiple occasions, in particular:

### (a)   *Little's August 1, 2018 Presentation*

146.   On August 1, 2018, Little convened a teleconference meeting, broadcast to Microsemi's sales executives.  Upon information and belief, during the meeting Little disparaged Microsemi's former management, including Plaintiffs, stating that Microchip was in financial trouble caused directly by the management decisions of Plaintiffs.  Little further claimed that Plaintiffs caused Microsemi to over-ship inventory to its distributors, "stuffing" the distribution channel, and thereby "deceived"

THEODORA ORINGHER
COUNSELORS AT LAW

its customers and Microsemi's employees.  Little claimed that Microsemi had over four months of inventory in the channel, making no distinction between Microsemi's various product lines and their differing inventory levels, and argued that a normal inventory level would be two and a half months.

147.   Little further criticized the profitable ASA program and characterized it as "games played," ignoring the mutually beneficial business arrangement between Arrow and Microsemi and its customers.

148.   Similar to Sanghi's tactic following the Atmel acquisition, Little cited this financial trouble, which he blamed on Microsemi's former management, as justification for withholding the payment of incentive compensation to Microsemi's salesforce.

149.   The August 1, 2018 meeting was accompanied by a slide deck, presented electronically via the WebEx system (the "WebEx Presentation").  Via the WebEx Presentation, Defendants published a multitude of disparaging, false, and defamatory statements regarding Plaintiffs, including that:

- "The merger caused extreme stress on Microchip due to the actions of the Microsemi ex-management team."

- Microsemi under Plaintiffs' management had "[s]ystemic extreme over shipment of inventory for many quarters creating FAKE revenue growth."

- a "FAKE revenue process has caused a revenue decline of ~10% and a $100M reduction in cash flow."

150.   The WebEx Presentation also laid the groundwork for Microchip to justify reductions in compensation, stating that:

- The Microchip Board of Directors "are EXTREMELY concerned with the negative impact [ ] caused by the [Microsemi] issues" and "will zero out any [Microchip] discretionary bonus components."

- As a result of "the actions of the Microsemi ex-management team . . . employees of Microchip are making a sacrifice as [Microchip's] board zeroed out their discretionary bonus despite record results [and]

employees of Microsemi [will] need to also make the sacrifice . . . ."

- "There will likely not be . . . salary adjustments through the end of this calendar year as [Defendants] clean up excess inventory . . . ."

151.   Ironically, the WebEx Presentation concluded with a quote from John F. Kennedy imploring Microsemi's employees to "not seek to fix the blame for the past, [but] accept our responsibility for the future."  Defendants failed to take that quote to heart, however, and, by making their false and defamatory statements, have consistently sought to improperly shift blame onto Plaintiffs.

*(b)*   *The August 9, 2018 Earnings Call*

152.   On August 9, 2018, Microchip conducted its earnings call for the first quarter of Microchip's 2019 fiscal year (the "Earnings Call").  Representing Microchip on the call were Sanghi, Moorthy, and Bjornholt.  Also on the call representing Microchip investors were fourteen semiconductor industry analysts from a variety of Wall Street and other investment firms.

153.   Bjornholt, only three months after publicly stating that Microsemi's Leverage Ratio would be 4.7 for the fiscal quarter, explained that the Leverage Ratio was actually 5.0 "due to lower EBITDA from the Microsemi business driven by needing to correct distribution inventory levels."  This excuse was built on a lie.  On information and belief, Microsemi actually contributed *far more* to Microchip's EBITDA in the quarter than what Microchip had forecasted when it forecasted a 4.7 Leverage Ratio to its Lenders.   Specifically, Bjornholt had publicly stated his expectation that Microsemi would contribute between $160 to $180 million to Microchip's earnings for the quarter; in fact, Microsemi contributed upwards of $195 million.

154.   Nevertheless, Sanghi seized this opportunity to defame Plaintiffs and deflect blame onto them for Microchip's shocking refusal to issue earnings guidance. Sanghi reiterated that in his 28 years of being Microchip's CEO, he had "never seen as much excess as [h]e found in the case of Microsemi."

155.  Sanghi criticized Microsemi's distribution practices, lamenting "that Microsemi management was extremely aggressive in shipping inventory into the distribution channel," "Microsemi's distributors had about four months of inventory whereas Microchip's distributors carry about two and a half months of inventory," and "Microsemi [ ] over-shipped into the contract manufacturers by making deals and offering discounts."

156.  In addition, Sanghi attacked Plaintiffs' relationships with their distributor-customers, claiming that "[t]he . . . Distributors are telling us that this tension about such a large amount of inventory jamming took all the oxygen out of the room, . . . [and] consumed the entire energy and interaction with the distributors."  During Plaintiffs' tenure at Microsemi, however, Microsemi enjoyed long and mutually beneficial relationships with its distributors, most notably Arrow.  By contrast, on information and belief, Microchip recently strong-armed Arrow into ending the ASA program, to Arrow's (and Microsemi's) detriment.

157.  Notably, Sanghi did not address the unique business requirements for Microsemi's products that necessitated higher inventory levels in Microsemi's distribution channels when compared with Microchip.  This mischaracterization of "over-shipping" and "channel stuffing" could have been excused by ignorance on Sanghi's part as to Microsemi's business, however Sanghi's further efforts to shift blame onto Plaintiffs revealed that he had no interest in, or use for, providing the truth about or context for Microsemi's distribution practices.

158.  Strangely, Sanghi criticized the FASB for publishing guidance on GAAP revenue recognition, which required Microsemi and Plaintiffs to recognize sales as revenue once product went into the distribution channel.  Sanghi reiterated that Microchip would instead provide non-GAAP compliant numbers, recognizing revenue only when their products were sold on from distributors to end users.

159.  William Stein, a Wall Street analyst on the call, recognized the illogic of Sanghi's position, and noted that "Microsemi having stuffed" its distribution and other

THEODORA ORINGHER
COUNSELORS AT LAW

sales channels should not have reduced Microchip's non-GAAP revenue numbers, which would have recognized the value of products sold through to the ultimate customers. Sanghi deflected Stein's point and responded that Stein's point "would be the case if everything was pure, . . . [b]ut everything was not pure, . . . [as] ex-management has also taken – every quarter they would take some direct customers and move them to distribution by giving distribution some discounts so they could make a margin on it." Sanghi's response was nonsensical; moving customers from direct sales to distribution would not necessarily help to boost revenue, because Microsemi realized much lower margins on sales to distributors.

160.   Despite this apparent skullduggery by Plaintiffs, however, Microchip refused to split out Microsemi's financials from Legacy Microchip. Unbeknownst to the investors, this was due to the fact that Microchip, not Microsemi, had far underperformed against its forecast, and Sanghi was desperate to deflect attention and redirect it to his contrived issues with Microsemi.

161.   So, Sanghi blatantly insinuated that Plaintiffs had stuffed the channel and created fake revenue to pump up the value of the Company in advance of the Merger, stating that "you can't totally put your finger on it, but a lot of that seemed to coincide when it was sort of decided when the company would be sold." This was a naked accusation of securities fraud against Plaintiffs that Sanghi had to know was false, given the consistency of Microsemi's channel inventory levels for years prior to receiving Microchip's *unsolicited* offer to purchase Microsemi and that Microsemi's distribution practices did not change during the course of its negotiations with Microchip.

### (c)   *The August 16, 2018 All-Hands Meeting*

162.   On August 16, 2018, Sanghi held another all-hands meeting with Microsemi employees, during which Sanghi presented the same WebEx Presentation originally shown by Little to Microsemi's sales executives. In restating his allegations that Microsemi executives engaged in "inventory stuffing" to artificially inflate

revenue, Sanghi described Plaintiffs' management decisions as "Fake News." Specifically, Sanghi claimed that Microsemi's profit and loss numbers were "fake, the revenue was fake" and that Plaintiffs utilized a "[f]ake revenue process [that] has caused [Microsemi] a severe revenue decline and $100 million reduction in cash flow for the quarter, . . . and more, because there's still high inventory and there's another $80-100 million that's not going to get shipped this quarter."

163.   According to Sanghi, as far as Microsemi's employees were concerned, Plaintiffs had concocted a scheme to "[get] all the field managers, marketing guys and sales people got together, . . . take that $300 million and stuff it" into the distribution channel by going "around the world and [making] deals with distributors at discounts, and giving interest subsidies, and doing all sorts of other stuff to really sell their product." As a result, Sanghi claimed, Plaintiffs' distributors were carrying "about four months of distribution inventory, [whereas] [n]ormally there's about two-and-a-half." Sanghi made no effort to contextualize the reasons for the difference in inventory, nor did he differentiate among Microsemi's many, varied products.

164.   Sanghi falsely accused Plaintiffs of utilizing accounting tricks to pump up revenue, one of which Sanghi described as "[occurring] every quarter [when] they would identify some products as 'end of life,' y'know, build a two, three, four years of inventory, ship it into distribution, take it all as a revenue." Sanghi either did not comprehend, or chose to misrepresent, the purpose of the ASA program.

165.   The blame for this financial apocalypse, Sanghi claimed, belonged to Plaintiffs, telling Microsemi employees, Plaintiffs' former friends and colleagues, that "[i]t is not [Microchip's] fault – it is not your fault, . . . [but rather] the fault of three levels of management who are not here." Sanghi specifically named and singled out Peterson and Pickle as among those responsible for turning Microsemi into a company full of "[g]ood people, good products, but very, very poor management decisions." Sanghi claimed "[Microsemi employees] didn't want to be part of this channel-stuffing, . . . [b]ut with three levels of management above them, they did what they had to do to

survive in their jobs – they followed the orders." This, according to Sanghi, "was the biggest problem that actually made Microsemi vulnerable," as, "[i]f this deal had broken for any reason, and hadn't gone through for Microchip, this would have been a major crash on Microsemi's stock."

166. Going even further, Sanghi characterized Plaintiffs as criminals, describing their actions as on par with historic examples of accounting fraud such as the Enron and WorldCom affairs. Indeed, Sanghi maintained that actions like Plaintiffs' "make a company vulnerable." Because of Plaintiffs, Sanghi argued that "[i]f Microsemi hadn't sold, this couldn't continue more than another quarter or two," and "eventually [ ] would come crashing down, because there was so much inventory in distribution nobody would want that product, and factories were full building products that nobody wanted." Microsemi employees sat and listened to Sanghi's hypotheticals about "[how] the fall [of Microsemi] would [have] come crashing down, like a WorldCom or Enron," had Plaintiffs not duped Microchip into buying their "vulnerable" company, thus "mak[ing] it somebody else's problem."

*(d)    Moorthy's September 5, 2018 Interview*

167. Upon information and belief, on September 5, 2018, Moorthy was interviewed publicly during the Management Discussion Section of Citigroup's Global Technology Conference. According to a transcript of the interview, which was conducted in front of conference attendees, the interviewing Citigroup analyst asked Moorthy a series of questions about Microchip's experience with the Merger.

168. Notably, the interviewer's questions assumed the truth of Defendants' defamatory statements regarding Plaintiffs, demonstrating how Defendants' campaign of lies and disparagement had successfully poisoned the public's opinion of Plaintiffs. The interviewer credited Sanghi's prior comments about how Plaintiffs had concealed from Defendants "about $100 million in . . . excess inventory," and noted that investors were now wondering about "the true sort of revenue run rate of Microsemi."

169. Moorthy's answer to this question reinforced the interviewer's – and Wall

Street investors' – belief in Defendants' concocted and defamatory story, stating that Plaintiffs had "manufacture[d] revenue," by "aggressively . . . shipp[ing orders] ahead of what consumption was, leaving an inventory mostly in the channel," far "ahead of . . . [what was] really required."  As a result, Moorthy explained, "the starting-off point on the cash generation portion is lower than what we had anticipated," since "the revenue [was] a little undetermined and [therefore] lower than what we had anticipated as well." Moorthy provided no financial analysis to support these statements.

**2.     Defendants have Lied about What Was Disclosed During the Acquisition**

170.   Not satisfied by simply defaming Plaintiffs for how they ran Microsemi, Defendants have also repeatedly lied about what Microsemi and Plaintiffs disclosed, and consequently what Microchip knew, about Microsemi's financials and operations prior to Closing.

171.   Specifically, Defendants have repeated the false and defamatory lie that Microchip "had no way of knowing about" the purported shipping of product in excess of demand because Microchip's "access to all of the Microsemi data was limited to a very small subset of the total data that was totally controlled by" Plaintiffs.

172.   That is false.  Plaintiffs and Microsemi responded to all of Microchip's requests for information, to the fullest extent permitted by privacy and anti-trust laws, by providing Microchip with access to the Data Room, answering all ad hoc requests for information, and participating in a plethora of inter-company executive meetings and presentations.  Within these meetings, presentations, and disclosures, of course, Microsemi and Plaintiffs disclosed to Defendants detailed information regarding Microsemi's revenue recognition practices and historic distribution channel inventory levels, including Sansone's Inventory Report.

173.   Again, Defendants knew or should have known about these disclosures, particularly since Plaintiffs Goerner and Sansone met on multiple occasions with Defendants and other Microchip executives to discuss and explain Microsemi's distribution relationships and sales practices.  In any event, Defendants at a minimum,

showed a reckless disregard for the truth when they repeatedly disseminated the lie that Plaintiffs failed to disclose material information and impliedly accused Plaintiffs of fraudulent activity.

174. Moreover, Defendants' criticism of Microsemi's practice of keeping three to four months of inventory in the channel is premised on their assumption that Microsemi shipped excess inventory in order to immediately record revenue on all shipped product.  That assumption reveals Defendants' lack of understanding of Microsemi's business.  The amount of inventory in Microsemi's distribution channel does not equate to revenue for Microsemi on the entire amount.  For example, Microsemi's distributors showed high levels of phantom inventory certain products, including SOC and EMC products.  The Company therefore only took revenue on a net amount of what the distributors were carrying for those products.  At times that phantom inventory could be as high as forty to forty-five percent (40-45%) at a given distributor.  Defendants apparently lack understanding of this concept, despite the data and explanations on this subject provided to Defendants pre-Closing.

(a)    Little's August 2, 2018 Email

175. Upon information and belief, following the Little's August 1, 2018 teleconference, Little received emailed questions from Microsemi employees regarding Defendants' allegations against Plaintiffs.  In an August 2, 2018 email, Little purported to respond to those questions, including one which asked "[w]hy did Microchip not know" about Microsemi's inventory levels and "what they were investing in."  Little responded in a manner that has become Defendants' company line, falsely claiming that Microchip's "access to all of the Microsemi data was limited to a very small subset of the total data that was totally controlled by [Microsemi ex-management]."  Little went on to say that "[n]ot until the deal was actually closed did [Microchip] gain access to all of the information."  Little claimed that Microchip "had no way of knowing about any of the issues that [he] raised" in the WebEx Presentation "until after the culmination of the deal and extensive research."

THEODORA ORINGHER
COUNSELORS AT LAW

176.   Little's written statement that Microsemi limited access to inventory and revenue data is demonstrably false.  Microchip had access to the Data Room, which contained all information necessary for Microchip to confirm Microsemi's revenue recognition procedures and the assess the validity of its revenue numbers.  In addition, Microsemi executives, including Goerner and Sansone, communicated this information to Microchip executives, including Little, in the course of their many meeting(s) prior to the Closing and by providing Sansone's Inventory Report in April 2018.

*(b)*      *The August 9, 2018 Earnings Call*

177.   During the Question & Answer session of the Earnings Call, Sanghi was asked to elaborate on what, specifically, Plaintiffs had done wrong.  Sanghi blamed Plaintiffs for providing insufficient access to information during the diligence period leading up to the Closing complaining that "[t]his has been the time when we are able to get access to all the [Microsemi] information that we were not able to get before, . . . when we discover some of the weaknesses that we have found in other acquisitions like Atmel and Micrel."

178.   Sanghi's statements were widely disseminated to the public and by the press, as was Sanghi's intent.  As a result, Plaintiffs' reputations in the semiconductor industry and among the wider public have suffered, with many observers accepting Sanghi's false representations as fact.

179.   In one example, a commenter discussing the Earnings Call on the financial markets content service *Seeking Alpha*, adopted Sanghi's lie that Plaintiff's defrauded Microsemi by hiding their "fake" revenue processes, writing that Sanghi "came out and said [Microsemi] was borderline on breaking the law, implying perhaps that they may yet uncover activities that were not only unethical but illegal."

*(c)*      *The August 16, 2018 All-Hands Meeting*

180.   At the August 16, 2018 All-Hands Meeting, Sanghi doubled down on Defendants' defamatory rhetoric, blaming Plaintiffs' supposed failure to disclose information for Microchip's dire financial state and the resulting curtailing of incentive

compensation payments by Microchip.

181.   According to Sanghi, Microchip was blindsided by an "extra" month of inventory in Microsemi's distribution channels and that one extra" month had ruined Microchip's value to investors.  Sanghi claimed that, not only had Microchip "lost $3 billion of market value," but Microchip risked a downgrade of its bonds "to a junk status."  This was all due to Microchip misapprehending Microsemi's cash generation potential because, according to Sanghi, Defendants had no way of knowing about Microsemi's distribution practices.  This is patently false.

182.   By Sanghi's calculations, Microchip overpaid for Microsemi by $1 billion and had lost $3 billion in market value as a direct result of the Merger.  Notably, Sanghi did not discuss Microchip's organic performance, separate from Microsemi, and how that may have affected Microsemi's valuation.

183.   Given the size of the damage allegedly caused by Plaintiffs, Sanghi warned that "there's almost no way . . . to collect a sizeable amount of money to really repair a $4 billion damage."  Thus, Sanghi lamented to his new found compatriots, "we've all been victimized – you, me, everybody, we've all been victimized by the ex-management."

### (d)   Moorthy's September 5, 2018 Interview

184.   Upon information and belief, during Moorthy's September 5, 2018 interview with Citigroup, the interviewer characterized the Merger as "a bit of a speed bump" and asked Moorthy to explain "what [Defendants] missed  in terms of Microsemi."  Moorthy repeated the fiction that Defendants supposedly "learned some things post close that [they] had not seen in our diligence and had not anticipated, primarily surrounding [Microsemi's] revenue recognition policy for and in particular, how aggressively revenue was being shipped ahead of what consumption was, leaving an inventory mostly in the [distribution] channel . . . ."  Moorthy made no mention of the many disclosures Plaintiffs made regarding their distribution and revenue recognition practices, or the fact that Microsemi's inventory levels in the channel

1  remained stable because it shipped into the channel at roughly the same rate as its
2  distributors sold products to customers.

3      185.   Seemingly surprised that Microchip did not anticipate Plaintiffs' purported
4  tactics, the interviewer emphasized that investors "[have] seen with other
5  semi[conductor] acquisitions, channel stuffing pop-up as well," and pressed Moorthy to
6  explain how Plaintiffs' conduct "[did] not get discovered [by Microchip] during the
7  normal due diligence process."   Moorthy again claimed that Plaintiffs had deceived
8  Defendants, averring that "three levels of [Microsemi] management" that "are no
9  longer" with Microsemi prevented Microchip's access to key data.

10      186.   Moorthy revealed how Defendants have developed a pattern and practice
11  of being surprised by adverse information only after closing acquisitions, noting that
12  Defendants "had that with Atmel [and] Micrel."   Moorthy went on to describe the first
13  few quarters following the 2015 Micrel and 2016 Atmel acquisitions as "a trough of
14  disillusionment . . . as you learn all the things that you didn't know."   Of course, this set
15  Defendants up to be the heroes for Microchip's investors, when they inevitably turned
16  around these "failing" companies.

17      187.   Given Defendants' complaints about a lack of access to information
18  leading up to the Closing, the interviewer astutely asked Moorthy why Microchip
19  "[went] through [the acquisition] so quickly," as "[l]ess than three months" had passed
20  between the time "[Microchip] announced and then closed Microsemi . . . ."
21  Interestingly, Moorthy revealed that Microchip's internal philosophy is "[to] take time
22  and effort to move as fast as we can from definitive agreement to close," and noted that
23  "it was 70 days in the case of Atmel."

24      188.   Moorthy, however, did not attempt to put any blame on Defendants for
25  ignoring Plaintiffs' voluminous disclosures.   Instead, Moorthy blamed the complex
26  channel-stuffing machinations supposedly employed by Plaintiffs, stating:   "If you do
27  the sell-in with discounts, obviously you provide incentives. If you provide . . . excess
28  shipments to take place with interest subsidies, you're protecting the buyer.  So, there's

many mechanisms [for channel stuffing] available.  They are hard to see in the context of a diligence in which you have limited exposure to people in the company and you have public information, but none of which would show that you are shipping anything which is not accepted by someone who is a willing buyer in the whole process. . . . I think the degree and the creativity to which it was done in this case was, probably stretched our imagination from what we have seen."

189.    Moorthy was happy to confirm the interviewer's impression, gleaned from Moorthy and Defendants' comments, that Plaintiffs were to blame.  Responding to Defendants' comments, the interviewer opined that Plaintiffs must be "some very smart people" who are "good at hiding stuff."  Moorthy's pithy retort: "those kind of smart people [*i.e.* Plaintiffs] are no longer" at Microsemi.  When asked how investors could be sure "there's nothing else under the [Microsemi] covers," Moorthy implied that Plaintiffs were the cause of all of Microchip's newly disclosed problems, responding that investors could be reassured by the fact that, on "May 29 after [the Merger] closed, [Defendants] took out three levels of management at Microsemi [and as Defendants] got to the right levels of management, people who are running businesses, people who are running factories, people who are running particular portions of sales and all that, within the first few weeks, [Defendants] had all of the data" allegedly concealed by Plaintiffs.

190.    Moorthy concluded the question-and-answer session by discussing the importance of being an aggressive "consolidator," both generally and in the semiconductor industry.  Generally, "[if you] go back and look at what happened in the pharmaceutical industry, . . . you can fairly reliably plot that over a 15-year period of time, consolidation largely brings it down to the final 10, 15 type of players that are left behind in there."  Defendant clarified that "the semi industry is on that [timeline]," too, "[and] if you plot it, [Microchip is] exactly on that same slope."  Defendant seemed to believe, however, that time was running out: "there's probably [only] another 5 to 10 years of consolidation left," but "I don't think [Microchip] would pursue another

acquisition until we bring our leverage down, . . . [which] won't be for the next couple of years plus . . . ."  These comments suggest that both Microchip's failure to conduct adequate diligence in acquiring Microsemi, as well as Defendants' increasing hostility toward Plaintiffs since closing the deal, can be traced to a single cause: not concealment or misrepresentation by Plaintiffs, but rather Microchip's aggressive plan to consolidate the semiconductor industry, before time runs out.

**3.     Others Have Echoed and Amplified Defendants' Defamatory Statements**

191.   On August 10, 2018, *Investor's Business Daily* published an article by Patrick Seitz entitled "Microchip Technology Inherits Mess From Microsemi Deal". Seitz quoted Sanghi's defamatory statements from the Earnings Call without questioning their veracity, granting them total credence.  Even worse, Seitz's article amplified Defendants' implicit and intended lie that Plaintiffs acted fraudulently, quoting analyst Hans Mosesmann of Rosenblatt Securities stating that "Microsemi sold the company dishonorably to Microchip with major inventory shenanigan practices that (will) impact Microchip for the next two quarters."  Mosesmann's irresponsible statement, and Seitz's willingness to publish it, were the natural and intended result of Defendants' lies.

192.   Defendants' concerted effort to poison the well against Plaintiffs continues to make headlines in various media that is followed closely by professionals in the semiconductor industry.  On September 10, 2018, for instance, Piper Jaffray, an investment bank and asset management firm, published to its clients an Industry Note that, in part, summarized a meeting with Bjornholt.  Piper Jaffray cited Bjornholt when it parroted Defendants' false, damaging narrative previously, advising their client base that "there was no way [for Microchip] to know the channel inventory issues associated with Microsemi prior to the actual acquisition."  According to Bjornholt, these issues were undiscoverable "[g]iven the rules around acquisition-related communication."  Bjornholt neither clarified what "rules" he was referring to, nor did he explain how these rules could prevent Defendants from reviewing the information that Plaintiffs

1   provided months before the Closing.  Bjornholt's statement is clearly false given that
2   his own requests, relayed on March 23, 2018 to Goerner, resulted in the Inventory
3   Report and extensive disclosures by Plaintiffs to inform Bjornholt and the other
4   Defendants with all of the facts about Microsemi's channel inventory.

5       193.   On September 18, 2018, the financial services company Raymond James
6   published an update on Microchip, focused on the acquisition of Microsemi.  Raymond
7   James cited Microchip management as stating that Microsemi "may have been
8   overshipping for more than two years " and that "Microchip expect[ed] inventories to
9   be normalized by year-end, with the March 2019 quarter representing first 'clean'
10  quarter of [Microsemi] sales."  Raymond James was echoing Defendants' lies, as it is
11  clear that Microsemi's distribution practices were reasonable and sales reflected
12  ultimate demand for its products.  Nonetheless, the industry has endorsed Defendants'
13  misleading narrative.

14      **E.      Defendants' Defamed Plaintiffs in Order to Enrich Themselves**

15      194.   Despite ample time and access to more than adequate information to
16  understand Microsemi's business and revenue, Defendants have chosen to paint
17  themselves as saps who have been duped by Plaintiffs.  Why would they choose this
18  course of action, particularly where it could open them up to scorn and, potentially,
19  legal action from their shareholders?  The answer is a multi-faceted one, but in essence
20  amounts to a misdirection gambit whereby Plaintiffs can be blamed while Defendants
21  manufacture conditions more conducive to their own self-enrichment.

22      195.   Defendants fabricated lies about Plaintiffs, and intentionally and
23  maliciously published those lies to Plaintiffs' former colleagues and the industry at
24  large, to benefit Defendants in at least three ways.  First, by falsely claiming that the
25  inventory levels were not connected to demand, Defendants have created grounds to
26  claim there was a "fake revenue process" which would provide Defendants with cover
27  for any deficiencies in Microchip's overall performance; instead, Plaintiffs have been
28  put forth as a whipping boy for all of Microchip's ills.  Second, this fabricated financial

crisis at Microsemi provides Defendants with grounds to justify denying bonuses to Microsemi and Microchip employees and prohibiting the shipment of valid orders from Microsemi distributors, thereby preventing Microsemi salespeople from meeting their incentive compensation targets.  Third, Defendants wished to create false headwinds for Microchip, lowering Microchip's share price and thereby receiving a relatively larger number of shares upon negotiating their quarterly equity incentive compensation packages.

## 1.   Defendants Needed a Scapegoat for Microchip's Flagging Performance

196.   While Wall Street analysts look at a host of metrics when evaluating a company, the vast majority of the analysis comes down to one question:  can this company, which is to say its leadership, grow its revenue year over year, resulting in an increase in share price?  Revenue growth is of such primacy that the industry standard for executive incentive compensation plans provides that executives' compensation packages are tied to two metrics:  Net Revenue and Earnings Per Share.   In short, if a CEO cannot grow his or her company's business, then he or she will not be CEO for long.

197.  By early 2018, Defendants must have known that Microchip's performance was flagging and that a poor earnings report was virtually certain.  Defendants would thus have been incentivized to find someone or something to take the blame when the other shoe inevitably dropped.

198.  There is no doubt that "classic" Microchip was in trouble when Defendants began making these defamatory statements.  On May 8, 2018, Microchip provided guidance that, for its fiscal quarter ending June 30, 2018 ("Q1FY19") it was projecting revenue of $1.012 to $1.062 billion.  On May 31, 2018, two days after the Closing, Microchip projected that Microsemi would add between $160 million to $180 million in revenue to Q1FY19, yielding a combined guidance of $1.172 to 1.242 billion.  Around this same time, Microchip was projecting that its Leverage Ratio for Q1FY19 would be 4.7 to 1.

199.   On August 9, 2018, however, Microchip released its earnings for Q1FY19 (the "Earnings Report").   The Earnings Report raised alarm bells, claiming that Microchip was "adversely impacted by $226.9 million of Microsemi purchase accounting, restructuring and other charges," and further inaccurately claiming that "Microsemi was extremely aggressive in shipping inventory into the distribution channel." Notably, Microchip refused to provide earnings guidance to its investors as to what to expect for future quarters.  Additionally, Microchip had to admit to investors and its Lenders that its Leverage Ratio had actually climbed to 5.0 to 1.

200.   Defendants inevitably faced questions from their shareholders and the Lenders regarding the disastrous Q1FY19 earnings report.  In response, Defendants ramped up their defamation against Plaintiffs to divert attention from the real reasons for Microchip's financial struggles.  Specifically, on the Earnings Call, Defendants told their investors that they had only just discovered that "[a] fair amount of [the] correction [to Microchip's revenue guidance was] really on the Microsemi side" because "Microsemi management was extremely aggressive in shipping inventory into the distribution channel."   Defendants blamed the Leverage Ratio miss on "lower EBITDA from the Microsemi business driven by needing to correct distribution inventory levels."

201.   Sanghi further claimed on the earnings call that, to "clean up excess inventory" Microchip had elected to "ship[] close to $100 million less in the month of June than Microsemi ex-management would have shipped."  Sanghi told investors that the "$100 million less that [Microchip] shipped was a combination of . . . lower shipments from distribution to contract manufacturers and also to direct customers because [Microsemi ex-management] were . . . shipping excess product into every channel." According to Sanghi, "more than half of [the reduced shipment in June 2018] was a correction in [the] distribution" inventory channel.

202.  Upon information and belief, however, in June 2018 Microsemi contributed approximately $195 million in revenue to Microchip's Q1FY19 financials,

8.3% more than the high end of Microchip's own guidance, despite Sanghi's claim that Microchip shipped $100 million less than expected.  Classic Microchip, on the other hand, accounted for only $1.022 billion in revenue for the entire quarter, or just under 1% over Microchip's lower end guidance.  If Sanghi had split out financials, the struggles of Microchip would be laid bare.  In reality, Microsemi *saved* Microchip's quarter.

203.   During the Earnings Call, analysts requested that Microchip break out Microsemi's numbers separately in Microchip's reporting  so everyone could see for themselves how classic Microchip had performed and the impact of Microsemi on the quarter.  Sanghi, however, refused to split out classic Microchip's financials from Microsemi's finacials.  Instead, Sanghi pointed to a supposed edict from Microchip's Board of Directors – of which Sanghi is the Chairman –  to "not breakout the individual components of Microchip and Microsemi and . . . engage in the old controversy of organic versus inorganic growth . . . ."  Sanghi attempted to explain this excuse by reasoning that because "[t]here was so much inventory [in Microsemi's distribution channel] the [Microchip] Board [of Directors] doesn't want to put the energy on what doesn't add value in us really driving the business."  To date, Defendants have refused to report Microsemi's financial information separate from Microchip as a whole, despite the alleged taint from the newly acquired Microsemi.

204.   Given the relative performance of Microchip and Microsemi in Q1FY19, the reasons for Sanghi's reluctance to provide more detailed financials is clear – to do so would expose his lies.  By only giving consolidated numbers, and claiming that the downward-revised future projections are the fault of Plaintiffs – supposedly due to "fake" revenues, "over-shipping" product, "excess inventory", and "channel stuffing" – Sanghi and the other Defendants were able to cover up the real problem:  their inability to grow Microchip's core business.

205.   Not surprisingly, Defendants' statements in the Earnings Report and on the Earnings Call, and the subsequent crash of Microchip's stock price, has prompted a

backlash from Microchip shareholders.  Two shareholder class actions have already been filed against Microchip and Sanghi relating to this crash in Microchip's stock price, including: *Maknissian v. Microchip Tech. Inc., et al.*, No. 18-cv-02924 (D. Az. filed September 17, 2018); *Jackson v. Microchip Tech. Inc., et al.*, No. 18-cv-02914 (D. Az. filed September 14, 2018, First Amended Complaint filed February 22, 2019).

## 2.    Defendants Created a Justification to Deny Compensation to Employees

206.    Defendants' defamatory statements provide cover for Defendants to deny Microsemi (and Microchip) employees incentive compensation.

207.    Throughout his tenure at Microchip, Sanghi has been notorious for cost cutting and paying below market compensation.  Plaintiffs, on the other hand, had rewarded Microsemi employees with generous incentive compensation and commission agreements.  By sharing Microsemi's success with its employees, Plaintiffs had boosted Microsemi's performance and productivity.  Sanghi apparently has no interest in maintaining such performance at post-Merger Microsemi and has looked for justification to avoid paying out compensation otherwise owed to Microsemi, and indeed Microchip, employees.

208.    This proved difficult for Sanghi, as Section 6.12 of the Merger Agreement provided that, for one year after the Closing, each retained Microsemi employee would be entitled to receive "compensation and benefits the value of which is not less favorable to the [employee] in the aggregate to the aggregate value of the compensation and benefits provided to such [employee] immediately prior to the" Closing.

209.    Thus, to avoid paying the bonuses, commissions, and other incentive compensation to which Microsemi's employees were entitled, Sanghi needed to fabricate grounds by which he could claim that the employees had not even *earned* that compensation.    A financial crisis, one ostensibly created by Microsemi's ex-management to boot, appeared to be the perfect excuse.

210.    Just as Sanghi did with the Micrel and Atmel acquisitions, he is now using Plaintiffs as a scapegoat to get out from his obligations to fairly compensate his

THEODORA ORINGHER
COUNSELORS AT LAW

employees.   During the August 16, 2018 All-Hands Meeting, Sanghi informed Microsemi employees that Microchip would not pay bonuses or other incentive compensation, including commissions, for 2018.

211.   In addition, as described above, Defendants have prevented Microsemi's salespersons from shipping valid orders from the Company's customers and distributors, under the justification that they needed to clear the distribution channel. This practice has effectively prevented any Microsemi salesperson from meeting the requirements to receive their incentive compensation, which in many cases accounts for more than 40% of their income.

212.   Throughout these machinations, Sanghi has explicitly blamed Plaintiffs as the ones that are responsible for taking money out of Microsemi employees' pockets. At the August 16, 2018 All-Hands Meeting, Sanghi lamented to Microsemi employees that "we've all been victimized – you, me, everybody, we've all been victimized by the ex-management."   Sanghi defamed Plaintiffs to their former colleagues, rhetorically asking "why didn't Microsemi management pay [bonuses] for the March quarter?" and claiming that Plaintiffs "didn't pay many other teams [and] didn't really reserve dollars for a lot of the other things because, hey, you know, leave this all hanging and somebody's coming to rescue.   Leave all these unpaid debts essentially, you know, unpaid."

213.   Sanghi's refusal to take ownership of his own parsimony and avarice, and his scheme to instead falsely blame Plaintiffs, has caused significant damage to the personal and professional relationships that Plaintiffs have cultivated with their former colleagues over decades.

**3.      Defendants Had a Perverse Incentive to See Microchip's Stock Drop**

214.   Defendants knew that they would benefit from an artificial and temporary dip in Microchip's stock price.   On information and belief, every financial quarter, the Individual Defendants are awarded incentive compensation in the form of Microchip stock.   The amount of stock awarded is based on an overall dollar value that is

determined by Microchip's Board of Directors, divided by the value of the stock at the time of granting.  If Microchip's stock price is artificially low, Defendants would receive proportionally *more* stock units for the same dollar-valued award than if the stock was priced fairly.  Once awarded this inflated amount of stock, the Individual Defendants could allow the Microchip stock price to return to fair value, thus reaping the benefits.

215.   The only way to manipulate the stock price lower, however, would be to represent to Microchip's shareholders and the public that the company was underperforming.  This would naturally lead shareholders to blame the Defendants.  But, the Defendants could not reasonably expect to receive their maximum compensation if that happened.  So, Sanghi and the other individual Defendants needed to avoid blame for Microchip's falling stock price; they needed a scapegoat.

216.   With the acquisition of Microsemi, Defendants had their answer.  The individual Defendants, led by Sanghi, fabricated their narrative that Microsemi's former management, including Plaintiffs, deceived Defendants into overpaying for Microsemi.  To absolve themselves of any responsibility for this supposed fiction, they repeated the lie that Plaintiffs had withheld information during the Merger process, thus preventing Defendants from discovering the supposed problems at Microsemi.

217.   Defendants' lies worked and the value of Microchip's stock fell from $98.08 per share on August 9, 2018 – immediately before the Earnings Call and Earnings Report – to $61.30 per share on October 24, 2018, a decline of 37.5%.  On information and belief, Defendants were issued equity awards in October 2018 and received a larger number of shares than they should have because of the based on such an artificially depressed stock price.  The share price remained depressed into January 2019 when, on information and belief, Defendants received another issuance of equity awards.

218.   True to Defendants' plans, however, Microchip's performance, and its stock price, rebounded once Defendants ended their (unnecessary) practice of

withholding shipments at Microsemi.  On February 5, 2019, Microchip released its earnings for the fiscal quarter ending December 31, 2018.  In a stunning reversal from Defendants' dire prognostications on the Earnings Call, Defendants were somehow able to fix in one quarter all of the supposedly disastrous distribution inventory issues that Sanghi had previously lied about.  Sanghi was quoted as saying that, as of December 2018 "[t]he accretion run rate from the Microsemi transaction already exceeds the 75 cents per share . . . which was [Microchip's] initial guidance for one year after the acquisition date."  That was because Microsemi had been accretive Microchip's performance all along.

219.   Notably, after Sanghi had repeatedly criticized the recognition of revenue once products were sold to distributors (*i.e.* sell-in revenue), Microchip advised that "in response to comments from and discussions with the Staff of the Securities and Exchange Commission [Microchip] will provide net sales guidance based on sell-in revenue recognition."  This change of practice by Microchip lays bare the falsity of Sanghi's criticism of Microsemi's revenue practices.

220.   Microchip's share price rebounded after the February 5, 2019 earnings report, reaching $91.51 per share on February 12, 2019, up 49% from the stock's artificially depressed October 24, 2018 low.

221.   Furthermore, in the face of this apparently disastrous decline in share price, Microchip's Board of Directors – led by Sanghi – nevertheless issued ever increasing record dividend payments on August 20, 2018 ($0.364/share), November 20, 2018 ($0.3645/share) and February 20, 2019 ($0.365/share). Sanghi, Microchip's largest individual shareholder, benefitted greatly from these payments, receiving nearly $5 million in dividend payments following the Merger. If Plaintiffs' actions had sold a weakened Microsemi and placed Microchip in a cash crunch, as Defendants had argued, then why would Sanghi and Microchip's Board of Directors continue to increase dividend payments?

222.   The truth was that there was no cash crunch and Microsemi was a strong

company that was even more accretive to Microchip than Defendants had expected. But, by defaming Plaintiffs to fabricate a crisis regarding the Microsemi acquisition, Defendants were able to deny compensation to their employees, temporarily manipulate the stock lower to their benefit, and escape blame for Microchip's apparent underperformance and failure to meet their forecasted Leverage Ratio all while collecting larger and larger dividend payments. Defendants should not be further rewarded by their malicious and fraudulent conduct.

**F.** **Defendants have Intentionally Harmed Plaintiffs with their Defamation**

223. Defendants' defamatory comments have been well publicized and disseminated in the semiconductor industry, including to Plaintiffs' colleagues and potential business partners and employers.

224. Each and every Plaintiff has observed that their professional reputations have been adversely affected by Defendants' false and defamatory publications regarding Microsemi's performance under Plaintiffs' leadership.

225. Peterson has been the face of Microsemi for almost two decades and his personal and professional reputations are inextricably intertwined with the reputation of the Company he built. Thus, in addition to the explicit and individualized defamation Defendants have directed at Peterson individually, Defendants' misrepresentations regarding Microsemi in general redound onto Peterson personally.

226. Goerner, as Microsemi's Senior Vice President of Worldwide Sales, played a central role in growing the Company's revenues year-over-year. By falsely asserting that Microsemi's revenues were "fake", Defendants have unjustly cast Goerner as a liar and a fraud in the eyes of his colleagues and the semiconductor industry. Goerner has suffered from this disparagement as he has been ostracized from the professional community in which he has spent decades building up his reputation.

227. Pickle spent years at Microsemi building a well-deserved reputation as an expert at maximizing profits for the Company. Prior to Defendants' defamatory campaign, Pickle's reputation among his colleagues and in the industry was

impeccable.  Now, just as he is looking to embark on the next phase of his career, his hard-earned, stellar reputation has been tainted by Defendants' false and defamatory publications.

228.   Sansone, who has been seeking further employment since his termination by Microchip, is informed and believes that Defendants' false and defamatory publications regarding Microsemi's performance under Plaintiffs' leadership have prejudiced his employment opportunities.  On one occasion, Sansone was informed by a potential employer that he would have to address Sanghi's false and defamatory allegations of "channel stuffing" and implied fraud.

229.   Defendants' defamatory statements have harmed them in their professional and personal capacities, seeping into every aspect of their lives.  Upon information and belief, Defendants have been disparaging Plaintiffs to semiconductor industry investors, claiming that they took improperly high compensation and citing that as evidence that they engaged in fraud.

230.   The damage to Plaintiffs' relationships with their former Microsemi colleagues has also been devastating.  On one occasion, a Microsemi salesperson met Pickle for coffee only to lament that he was being denied his commission payments, a significant portion of his total compensation,  because of the "over shipping and channel stuffing [Pickle] had done to the Company."  Goerner has had many similar encounters with former Microsemi colleagues who fault him for Sanghi's refusal to pay the incentive compensation that they earned and are owed.

231.   Plaintiffs have invested significant time and resources into the Orange County and Silicon Valley communities via philanthropic endeavors and their positions as community industry leaders.  Defendants' lies, however, have seriously, if not irreparably, damaged Plaintiffs' position in their tight-knit communities.

232.   Indeed, Plaintiffs' family members are naturally close with family members of others in the semiconductor industry, including other Microsemi employees, and family-members of Microsemi employees that have suffered due to

Defendants' actions are now blaming Plaintiffs and their families.  Defendants knew or should have known that their lies would impact Plaintiffs' personal relationships.

## FIRST CAUSE OF ACTION

### (Slander *Per Se*)

233.  Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 212 above and incorporate them by reference as though fully set forth herein.

234.  Plaintiffs allege that Defendants willingly, and without justification or privilege, uttered false and defamatory statements claiming that Plaintiffs utilized "FAKE" revenue procedures and deceptively withheld information regarding Microsemi's inventory and sales figures.

235.  The defamatory statements were orally uttered and directed to representatives and analysts for Wall Street investment firms including Credit Suisse, Raymond James, Morgan Stanley, Citigroup, and JPMorgan, among others.

236.  The defamatory statements were orally uttered and directed to current employees of Microsemi, Plaintiffs' former colleagues.

237.  Upon information and belief, the defamatory statements were orally uttered and directed to employees of Microchip.

238.  The Wall Street investment firm analysts and Microsemi and Microchip employees, to whom the statements were made, understood that the statements were about Plaintiffs, as the statements referenced, concerned, or mentioned Plaintiffs.

239.  The statements are defamatory on their face, and expose Plaintiffs to hatred, contempt, and ridicule.  The defamatory statements also had the tendency to directly injure Plaintiffs in their occupation by imputing to them a general disqualification in those respects which the public companies in general, and public semiconductor companies in particular, require, and by imputing to Plaintiffs negative attributes that have a natural tendency to lessen Plaintiffs' employability and reputation. Additionally, the statements attack Plaintiffs' veracity as esteemed and well-respected

1   business professionals.

2       240.   Defendants engaged in the slanderous campaign as part of Sanghi's plan to

3   impute to Plaintiffs the blame for Microchip's underperformance and thereby provide

4   an excuse to deny Microsemi and Microchip employees bonuses to which they would

5   otherwise be entitled.   Defendants also engaged in this slanderous campaign to

6   artificially reduce Microchip's earnings projections at the same time that Sanghi was

7   negotiating a new compensation package with Microchip's Board of Directors, thereby

8   providing lower equity incentive targets which would be easier for Microchip to

9   achieve, resulting in larger equity incentive awards to Sanghi.

10      241.   At the time that Defendants uttered the defamatory statements, Defendants

11  knew the statements were about the Plaintiffs, knew the statements were false, and/or

12  failed to take reasonable care to determine the truth or falsity of the statements.

13      242.   As a direct, proximate, and natural result of Defendants' slanderous

14  statements, Plaintiffs have suffered actual damage to their business, trade, and

15  profession.   By reason of the slanderous publications, Plaintiffs have suffered a lost

16  employment opportunities, loss of goodwill, and injury to their business reputations.

17      243.   As a further direct, proximate, and natural result of Defendants' slanderous

18  statements, Plaintiffs have suffered emotional distress including but not limited to

19  humiliation, anxiety, nervousness, depression, loss of self-esteem, and sleeplessness,

20  and have been generally damaged in an amount to be ascertained at the time of trial.

21      244.   Because the Defendants, and each of them, intentionally published the

22  false and defamatory statements, knowing them to be false and defamatory, and

23  knowing, furthermore, the devastating impact that such statements would have upon the

24  reputation and good will of Plaintiffs, they are guilty of malice, fraud or oppression as

25  those terms are defined generally under California law as stated in California Civil

26  Code §3294.  Because Sanghi's and Little's employer, Microchip, has authorized and

27  ratified the wrongful conduct of Sanghi and Little, and Does 1 through 10, inclusive,

28  and has in fact, participated in such conduct directly through Sanghi and Little, and

THEODORA ORINGHER
COUNSELORS AT LAW

1  Does 1 through 10, inclusive, as officers, directors or managing agents of the
2  corporation, it, as well as Sanghi, Little and Does 1 through 20, inclusive, are liable for
3  punitive damages in an amount necessary to punish such Defendants and to deter
4  similar conduct by others in the future.

## SECOND CAUSE OF ACTION

### (Libel *Per Se* – Against All Defendants)

7  245.   Plaintiffs repeat and re-allege each and every allegation contained in
8  Paragraphs 1 through 223 above and incorporate them by reference as though fully set
9  forth herein.

10  246.   Defendants published in a written format unprivileged, false statements of
11  fact giving rise to liability for defamation under California Civil Code §45.

12  247.   The false publications occurred in the form of writing, printing or other
13  fixed representation disseminated to Microsemi employees.

14  248.   The offending and false publications were spoken of and concerning
15  Plaintiffs by implication through context and otherwise.

16  249.   As a result of the false and defamatory publications of Defendants, and
17  each of them, Plaintiffs have been exposed to hatred, contempt, ridicule or disgrace,
18  and Plaintiffs have tended to suffer injury and losses in their occupations and
19  professions.

20  250.   These false publications of Defendants, and each of them, were made with
21  actual malice because Defendants knew the statements to be untrue and/or Defendants
22  operated with a reckless disregard as to the truth or falsity of the statements were true,
23  and were made with the express intent to harm Plaintiffs.

24  251.   The false publications of Defendants include, but are not limited to,
25  Sanghi's and Little's presentations to Microsemi including PowerPoint slides that
26  stated that Microsemi, under Plaintiffs' leadership, utilized a "fake revenue process."

27  252.   The false publications of Defendants also include, but are not limited to,
28  Defendant Little's August 2, 2018 e-mail to Microsemi sales personnel, stating that

THEODORA ORINGHER
COUNSELORS AT LAW

"[Microchip's] access to all of the Microsemi data [prior to the Closing] was limited to a very small subset of the total data that was totally controlled by [Plaintiffs]" and that Microchip "had no way of knowing about" Microsemi's distribution, inventory, and revenue recognition practices "until after the culmination of the" Merger.

253.   Examining these communications in the light of the context in which they were published, the occasion of their utterance, the persons addressed, the purpose to be served and all of the circumstances surrounding the publications, they imply a false factual assertion that Plaintiffs mismanaged Microsemi, recognized "fake" revenue, and fraudulently hid this practice from Microchip.  Nothing can be further from the truth. Microsemi, under Plaintiffs' leadership, had always recorded its revenue in accordance with GAAP and FASB rules and regulations, accurately reported its revenue to the public, and fully disclosed to Microchip all of Microsemi's distribution and revenue recognition practices and inventory levels in the distribution channel.

254.   The false and defamatory publications have exposed Plaintiffs to disgrace among their former colleagues at Microsemi and have injured them in their professions.

255.   There are no facts to support these false assertions that Plaintiffs employed "FAKE" revenue processes or hid information from Microchip during the Merger. Defendants knew that the assertions were untrue when they were made or, at a minimum, Defendants exhibited reckless disregard as to the truth of the assertions.

256.   These false and defamatory publications were made with ulterior motives – to excuse Microchip from having to pay out incentive and performance-based compensation owed to Microchip and Microsemi employees and to create false headwinds in advance of Sanghi's negotiation of new equity incentive compensation benchmarks.

257.   Because the publications are libelous *per se*, Plaintiffs need not plead or prove special damages.  Nevertheless, it is apparent that Plaintiffs have suffered damages in their business, trade, profession or occupation, as alleged herein.

258.   As a direct, proximate and legal result of the libelous publications of

Defendants, and each of them, Plaintiffs have suffered damages in the loss of business and employment opportunities, loss of good will, and injury to their business reputation in an amount which will be proven at trial.

259.   As a further direct, proximate, and natural result of the libelous publications of Defendants, and each of them, Plaintiffs have suffered emotional distress including but not limited to humiliation, anxiety, nervousness, depression, loss of self-esteem, and sleeplessness, and have been generally damaged in an amount to be ascertained at the time of trial.

260.   Because the Defendants, and each of them, intentionally published the false and defamatory statements, knowing them to be false and defamatory, and knowing, furthermore, the devastating impact that such statements would have upon the reputation and good will of Plaintiffs, they are guilty of malice, fraud or oppression as those terms are defined generally under California law as stated in California Civil Code §3294.  Because Sanghi's and Little's employer, Microchip, has authorized and ratified the wrongful conduct of Sanghi and Little, and Does 1 through 10, inclusive, and has in fact, participated in such conduct directly through Sanghi and Little, and Does 1 through 10, inclusive, as officers, directors or managing agents of the corporation, it, as well as Sanghi, Little and Does 1 through 20, inclusive, are liable for punitive damages in an amount necessary to punish such Defendants and to deter similar conduct by others in the future.

### **Prayer for Relief**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For a judgment that Defendants have committed slander against Plaintiffs;

2.     For a judgment that Defendants have committed libel against Plaintiffs;

3.     For an entry of an injunction restraining and enjoining Defendants, and all of their agents, successors, and assigns, and all persons in active concert or participation with any of them, from making, uttering, or publishing any further defamatory statements or misrepresentations about Plaintiffs or other former Microsemi executives;

4.      For an award of compensatory damages in an amount to be determined at trial according to proof;

5.      For an award of punitive damages against Defendants in an amount to be determined at trial;

6.      For an award of attorneys' fees and costs as allowed by law;

7.      For such other and further relief as the Court deems just and proper.

THEODORA ORINGHER PC

DATED:  April 15, 2019

By: _____
Jeffrey H. Reeves, Esq.
Todd C. Theodora, Esq.
Michael E. Bareket, Esq.
Attorneys for Plaintiffs